IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTUITIVE SURGICAL, INC. and INTUITIVE SURGICAL OPERATIONS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 18-1359 (MN) |
| AURIS HEALTH, INC., | ) ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM ORDER</u>**

At Wilmington this 16th day of December 2019:

IT IS HEREBY ORDERED that the claim terms of U.S. Patents Nos. 6,491,701 ("the '701 Patent"), 8,142,447 ("the '447 Patent"), and 8,801,601 ("the '601 Patent") with agreed-upon constructions (*see* D.I. 76 at 5, 8, & 25, are construed as follows:

1. "wherein at least one of said spools spool is engageable with a rotatable actuator body of a robotic surgical system" means "wherein at least one of said spools is engageable with a rotatable actuator body of a robotic surgical system" ('701 Patent, claim 11);

2. "moves the movable port on disposed" means "moves the movable portion disposed" ('447 Patent, claim 3);

3. "coupling an instrument to a drive assembly" means "coupling an instrument to a drive assembly" ('447 Patent, claim 3);

4. "wherein rotating the first plurality of rotatable bodies moves the movable port on disposed at the distal portion" means "wherein rotating the first plurality of rotatable bodies moves the movable portion disposed at the distal portion" ('447 Patent, claim 3);

5. "target location" means "site where a medical procedure is to be performed" ('601 Patent, claim 1).

Further, as announced at the hearing on November 20, 2019, IT IS HEREBY ORDERED that the disputed claim terms of the '701 Patent, the '447 Patent, the '601 Patent, and U.S. Patents

Nos. 8,620,473 ("the '473 Patent"), 9,452,276 ("the '276 Patent"), 6,246,200 ("the '200 Patent"), 6,800,056 ("the '056 Patent"), and 6,522,906 ("the '906 Patent") are construed as follows:

1. "[surgical] end effector" means a "device at the end of an instrument used in surgery designed to interact with the environment" ('701 Patent, claims 16 & 25; '447 Patent, claim 2; '200 Patent, claims 14 & 17; '906 Patent, claims 16 & 53);

2. "angularly displaceable about at least two axes" means "rotatable about at least two axes" ('701 Patent, claim 16; '447 Patent, claim 2);

3. "changing the displayed information" means "adding information under operator control relevant to the surgical procedure on or alongside a live image of a surgical site" ('906 Patent, claim 53);

4. "master control" means "input device of a master-slave configuration" ('906 Patent, claims 16 & 26);

5. "master input device" means "input device of a master-slave configuration" ('473 Patent, claims 1, 19, 20, 32, & 34);

6. "movement of the master input device" means "movement of the 'master input device' as that term has been construed" ('473 Patent, claims 1, 19, 20, 32, & 34);

7. "surgeon console" means "a console used by a surgeon" ('473 Patent, claims 32 & 34);

8. "imaging device" is not a means-plus-function limitation subject to 35 U.S.C. § 112(6) and the term shall be given its plain and ordinary ('276 Patent, claims 1, 4, 10, 12, & 14);

9. "hold or return the distal tip of the catheter to the desired working configuration" shall have its plain and ordinary meaning ('276 Patent, claims 1, 4, 10, 12, & 14);

10. "guidance" shall have its plain and ordinary meaning at this time ('601 Patent, claims 1 & 10);

11. "anatomic landmarks" means "anatomic structures that are or have been registered and recorded" ('601 Patent, claims 1, 2, 3, 10, & 12);

12. "freely slidable along the length of the instrument" / "guide being slidably disposed without constraint within the lumen along the length" require no construction and shall have their plain and ordinary meanings ('056 Patent, claims 1, 3, 14, 17, 22, & 32).

The parties briefed the issues, (D.I. 113), and submitted a Joint Claim Construction Chart containing intrinsic evidence, (D.I. 123, Attachment 1).[1] Defendant provided a tutorial describing the relevant technology. (*See* D.I. 111). Both parties submitted expert declarations and other extrinsic evidence. (D.I. 114). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 130) and applied the following legal standards in reaching its decision:

## I. **LEGAL STANDARDS**

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a

---

[1] The parties amended their original claim construction chart (D.I. 76) twice. (*See* D.I. 81; D.I. 123, Attachment 1). The Court references the second, and final, amended claim construction chart.

special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

*Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II. THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '701, '447, '473, '276, '200, '056, '601, and '906 Patents were announced from the bench at the conclusion of the hearing as follows:

> . . . [T]hank you for the arguments today. They were helpful. At issue we have eight patents and fifteen terms in dispute. I am prepared to rule on twelve of those disputes today. I will not be issuing a written opinion, but I will issue an order stating my rulings on those twelve terms. I want to emphasize before I announce my decisions that while I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed each of the eight patents, the portions of the prosecution history submitted, the joint appendix and the tutorial submitted by Auris. I have also reviewed the declaration of Mark Rentschler submitted by Plaintiffs and the declaration of Ron Alterovitz submitted by Defendant. There was full briefing on each of the disputed terms and there has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. I am not going to read into the record my understanding of claim construction law. I have a legal standard section that I have used earlier, including in my relatively recent order in *Omega Flex v. Ward Manufacturing*, C.A. No. 18-1004. I incorporated that law and adopt it into my ruling today, and I will also set it out in the order that I issue.

Additionally, with respect to the person of ordinary skill in the art in this case, Plaintiffs, through the declaration of Dr. Rentschler, define the person of ordinary skill in the art relevant to the '473, '447, '701, '200, and '906 patents as one having "a mechanical, electrical, computer science, or biomedical engineering degree and at least two years of experience using, designing, developing, studying, and/or testing robotic systems, such as minimally invasive robotic systems."[2]

Defendant, through the declaration of Dr. Alterovitz, offers the definition that a person of ordinary skill for "the '473 and '906 patents as of their invention dates would have [had] at least a bachelor's degree in robotics, electrical engineering, mechanical engineering, computer science, or a related field and at least two years of experience working on robotics technology. Alternatively, a person of ordinary skill would have had an advanced degree in robotics, electrical engineering, mechanical engineering, computer science, or a related field and at least one year of experience working on robotics technology."

The parties agree that the differences in definitions are not material to the claim construction issues before me.

As to the terms in dispute, the first disputed term, "end effector" is in claims 16 and 25 of the '701 patent, claim 2 of the '447 patent, and claim 16 of the '906 patent. This term includes "surgical end effector" as found in claims 14 and 17 of the '200 patent and claim 53 of the '906 patent.

Although "end effector" or "surgical end effector" is found in claims of four asserted patents, not all of which are related, the parties agree that the term means the same thing in each of the patents.

Plaintiffs define the term as a "device at the end of an instrument designed to interact with the environment during surgery." Defendant defines it as a "device at the end of a surgical

---

[2] Dr. Rentschler stated: "In my opinion, a person of ordinary skill in the art relevant to the '473 patent as [of] 2007 would have had at least a bachelor's degree in robotics, electrical engineering, mechanical engineering, computer science, or a related field and at least two years of experience working on robotics technology. Alternatively, a person of ordinary skill would have had an advanced degree in robotics, electrical engineering, mechanical engineering, computer science, or a related field and at least one year of experience working on robotics technology. In my opinion, the same level of skill would have applied to the '447, '701, '200, and '906 patents as of 1999." (*See* D.I. 114, Exhibit D ¶ 17).

6

instrument for manipulating (cutting, grasping or otherwise acting on) body tissue."

The crux of the dispute as set out in the papers is twofold. First, whether the end effector is at the end of a surgical instrument, as opposed to any instrument, and second, whether the end effector must manipulate body tissue or simply interact with the environment during surgery.

I will construe the term to mean a "device at the end of an instrument used in surgery designed to interact with the environment." This construction is consistent with the ordinary meaning of the term as well as the intrinsic evidence.

Defendant agrees that the ordinary meaning of an end effector is "the device at the 'end' of a robotic arm, designed to interact with the environment" in the context of robotics, but disagrees that that definition applies in the context of robotic surgery. That, however, is the definition of end effector that Defendant used in its own patent, United States Patent No. 10,080,576, which addresses surgical and medical robotic devices.

The specifications of the '447 and '701 patents disclose examples of end effectors that can be used with the invention, including "[a] Potts scissor," "15 degree scalpel," "forceps," "microforceps," "clip applier," and "electrocautery probe." ['701 Patent col. 9, l. 67 – col. 10, l. 32; '447 Patent col. 9, l. 52 – col. 10, l. 16.] The specifications note that "[i]t should be understood that a wide variety of alternative end effectors for differing tool-types may be provided . . . ." ['701 Patent col. 10, ll. 19-31.] The '447 and '701 patents state that "the tools of the present invention may incorporate any of the illustrated end effectors, or any other end effector which is useful for surgery, particularly at an internal surgical site." ['701 Patent col. 10, ll. 28-31; '447 Patent col. 10, ll. 13-16.] The '200 patent specification provides a list of tools and image capture devices. ['200 Patent col. 5, ll. 50-65.] Although the '200 patent does not refer to these as end effectors, it explains that a variety of devices useful during a surgical procedure may be mounted at the end of the robotic arms. ['200 Patent col. 5, ll. 48-65.] These devices include "tools" and an "image capture device." [*Id*.]

The specifications talk about the invention broadly, and do not ascribe special significance to the "end effectors" used or their use for manipulating tissue. And consistent with that, in the

7

prosecution history, the patentees did not distinguish the prior art based on the specific end effector or its use to manipulate tissue.

Although Defendant points to embodiments in which the instrument is a surgical instrument and the end effector is used to manipulate tissue, as the Federal Circuit recognized in *SRI, Int'l v. Matsushita Elec. Corp. Of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc), a plaintiff is not required to "describe in [the] specification every conceivable or possible future embodiment." [*See also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004).]

I will thus refrain from reading [in] the limitations from embodiments in the specification that Defendant proposes I add. The Federal Circuit has cautioned against doing so in *CCS Fitness, Inc. v. Brunswick Corp.*, [288 F.3d 1359, 1366 (Fed. Cir. 2002)] and *Superguide Corp. v. DirecTV Enters., Inc.*, [358 F.3d 870, 875 (Fed. Cir. 2004),] and I will heed that caution.

The second disputed term is "angularly displaceable about at least two axes" in claim 16 of the '701 patent and claim 2 of the '447 patent. For this term, Plaintiffs assert that no construction is needed, but that if one should be required, it should be "rotatable about at least two axes." Defendant proposes it should mean "rotatable about at least two fixed axes."

I will construe this term to mean "rotatable about at least two axes."

The dispute here is over Defendant's inclusion of the word "fixed." Defendant asserts that the "claims and specifications make clear" that its proposed construction is correct. In support, Defendant points to claim 1 of the '701 patent, which claims a spool, and to an embodiment (Figure 6) that illustrates spools. Defendant argues that that embodiment (as well as the embodiment of Figure 5A) requires rotation about fixed axes.

The claim language of the asserted claims, however, is not so limited – it simply refers to two axes and does not require them to be fixed. And although Defendant points out that no embodiments depict axes that are not fixed, as the Federal Circuit stated in *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012), "'[i]t is . . . not enough that the only embodiments, or all of the embodiments, contain a particular limitation' to limit a claim term beyond its ordinary meaning," there must be more. [*Id.* (quoting *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362,

1366 (Fed. Cir. 2012)).] And here, there is not. I do not find that the embodiments cited by Defendant constitute such "clear limiting descriptions of the invention in the specification" that they evidence an intent to depart from the ordinary meaning of the term as would be required by *Aventis Pharma*[, 675 F.3d at 1330].

The third disputed term is "changing the displayed information" in claim 53 of the '906 patent. Plaintiffs assert that it means "adding information relevant to the surgical procedure on or alongside a live image of the surgical site." Defendant asserts it means "adding, under operator control, information relevant to the surgical procedure to an existing live image of the surgical site." Today Defendant agreed to the language "on or alongside a live image of the surgical site," that was proposed by Plaintiffs.

So we have one dispute here – whether the displayed information must be added "under operator control."

Plaintiffs assert that it is "unnecessary" to add that because the claim requires that "changing [of] the displayed information" is achieved by "manipulation [of a linkage of the input device] by a hand of a system operator." It objects to complicating the construction, not that it is incorrect. I do not think making clear that the changing of information is done by the operator overly complicates the construction. And I also find that that limitation is supported by the prosecution history. I will[, therefore,] include that language. In doing so, I am not finding that [the term as construed] requires active control. I think that requiring active control is adding a limitation that is not clearly required by the claim or the specification.

I will thus construe this term to mean "adding information under operator control relevant to the surgical procedure on or alongside a live image of a surgical site."

The fourth and fifth disputed terms are "master control" and "master input device," respectively.[3] The parties agree that these two terms should have the same construction. They differ as to what that construction should be. Plaintiffs argue these terms mean an "input device of a master-slave configuration." Defendant asserts that the terms mean a "user control device having links connecting joints to receive three dimensional input to command a slave device." Defendant asserts that ["master control" and "master input

---

[3] "Master control" appears in claims 16 and 26 of the '906 Patent. "Master input device" appears in claims 1, 19, 20, 32, and 34 of the '473 Patent.

device" are "terms of art" and the language it proposes is the plain meaning of those terms].

I will construe these terms to mean an "input device of a master-slave configuration." That construction is supported by the intrinsic evidence.

The parties agree that claim 16 of the '906 patent requires that the master control at issue here has linkages that can be manipulated in three dimensions. The addition of the language that Defendant proposes (i.e., "links connecting joints to receive three-dimensional input") is unnecessary and improperly renders other claim language redundant and superfluous. Defendant's proposed construction, thus, runs "contrary to the well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim" as stated in *Digital-Vending Services International*. [*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012).]

[Additionally,] the specification of the '906 patent is not as limiting as [Claim 16]. For example, at column 20, lines 31 through 40 of the '906 patent, it refers to input devices broadly to include "buttons, toggles, joysticks, mice, and/or the like," and then goes on to say that the master control devices are used as the input devices.

Similarly, with respect to the master input device, the '473 patent at column 28, lines 45 to 52 describes "master inputs" broadly to include "the surgeon's arm, wrist, hand, and finger movements on the master control mechanisms. Inputs may also be from other movements (e.g., finger, foot, knee, [etc.] pressing or moving buttons, levers, switches, etc.) and commands (e.g., voice) that control the position and orientation of a particular component or that control a task-specific operation (e.g., energizing an electrocautery end effector or laser, imaging system operation, and the like)." ['473 Patent col. 28, ll. 45-52.]

In light of the claims and specification as a whole, I will again refrain from reading in the limitations from embodiments in the specification that Defendant proposes I add.

The sixth disputed term is "movement of the master input device" in claims 1, 19, 20, 32, and 34 of the '473 patent. Plaintiffs argue that no construction is needed, or alternatively that it means movement of the "master input device" as previously construed. Defendant argues that it means "movement of the one or more links" referenced in its proposed construction for "master input device."

The parties appear to agree that this term means movement of the master input device as I have construed it, and I [also] agree. I will thus construe it to mean movement of the "master input device" as that term previously has been construed.

The seventh disputed term is "surgeon console" in claims 32 and 34 of the '473 patent. Plaintiffs assert that no construction is needed or, alternatively, if one is required, the construction is "a console that can be used by a surgeon." Defendant asserts that the construction should be "control station supporting the master input device and a display, used to control the instruments during a surgical procedure."

Here I construe the term by its ordinary meaning as "a console used by a surgeon."

Defendant cites to portions of the specification in column 11 to support its construction. Those lines of the specification discuss the particular console in the embodiment in Figure 4. They [describe] examples or embodiments and do not constitute "clear limiting descriptions of the invention in the specification" that evidence an intent to depart from the ordinary meaning of the term as would be required by the Federal Circuit in *Aventis*[, 675 F.3d at 1330].

Defendant also points to Plaintiffs' product materials for its da Vinci surgical system. That, again, may be an embodiment that has a console with particular features, but Defendant cites no case law suggesting that that is relevant to the construction of the term. And I will not read limitations into the claims based on those materials.

The eighth, ninth and tenth disputed terms are means-plus-function terms. For those terms, I am not prepared to rule today, and we can discuss how I would like to go forward on those in a minute.[4]

The eleventh disputed term is "imaging device" in claims 1, 4, 10, 12, and 14 of the '276 patent. Plaintiffs assert that no construction is needed, or alternatively, "a device that obtains imaging data." Defendant proposes "imaging device" is a means-plus-function term – the function being "obtaining images and

---

[4] At the end of the hearing, the Court instructed the parties that if they intend to go forward with the claims containing these terms, they should contact the Court to obtain a date for a hearing at which expert testimony further addressing these terms could be heard.

providing the obtained images to an operator interface" and the structure is "a CMOS camera 420."

Here, I agree with Plaintiffs that the imaging device is not a means-plus-function term and needs no further construction.

As an initial matter, I note that the limitation, unlike other limitations in the asserted patents, does not use the word "means." Thus, "there is a rebuttable presumption that [§ 112, ¶ 6] does not apply." *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1298 (Fed. Cir. 2018). The presumption, however, can be overcome "if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure.'" *Williamson v. Citrix Online, LLC*[, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2012))].

Defendant argues that "device" is a nonce word that typically does not connote sufficiently definite structure to a person of ordinary skill in the art and is therefore tantamount to reciting "means," and invoking Section 112, paragraph 6. [*See Williamson*, 792 F.3d at 1350; *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 785 (Fed. Cir. 2019).] The relevant inquiry here, however, is whether the "device" recited in the claims of the '276 patent connotes sufficiently definite structure to a person of ordinary skill. [*See TEK*, 920 F.3d at 785; *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018).] "To determine whether the claim limitation at issue connotes sufficiently definite structure to a person of ordinary skill in the art, we look first to intrinsic evidence, and then, if necessary, to the extrinsic evidence." *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 785 (Fed. Cir. 2019) citing *Phillips*. "The intrinsic record comprises the claims, the specification, and the prosecution history." [*Id.*]

First, I note that the term at issue is not simply "device" – it is "imaging device." And I find that the claim term recites sufficiently definite structure to avoid being subject to Section 112, paragraph 6.

For example, claim 1 requires that the size and shape of the imaging device must be such that it can [be "deployed in the main lumen"].[5] Dependent claim 14 requires that the imaging device

---

[5] The '276 Patent also states that tools deployed in the lumen, including "vision systems[s] for viewing of the target location," must "fit within the lumen." *See* '276 Patent col. 1, ll. 17-38.

12

"fills the main lumen" when it is deployed, which similarly implicates aspects of size and shape.

The specification of the '276 patent at column 9, lines 14 through 15 describes "an imaging device such as vision probe 400" which is depicted in Figure 4 and described over numerous columns in the specification.

At column 7, lines 8 through 30, the specification of the '276 patent provides additional structure of the vision probe 400. For example, the vision probe has "a flexible body with an outer diameter (e.g., about 2 mm) that fits within the main lumen" of the catheter and with multiple lumens that contain the structures of the vision probe. The structure of the vision probe includes a CMOS camera, which is at the distal end of the probe and connected through one or more signal wires that extend along the length of the vision probe.

And finally, although not dispositive, the Court also notes that Applicants never indicated that "device" was being used as a substitute for "means" in its claims and the Examiner never raised Section 112, paragraph 6 issues with respect to this limitation.

The twelfth disputed term is "hold or return the distal tip of the catheter to the desired working configuration," which is found in claims 1, 4, 10, 12, and 14 of the '276 patent. Plaintiffs again assert that no construction is needed, and propose in the alternative that only "working configuration" should be construed and it should mean "the desired pose, position, and/or orientation of the distal tip."

Defendant's construction consists of the words of the claim with some additional language tacked on, i.e., "hold or return the distal tip of the catheter to the desired working configuration in response to measurement signals from sensor system."

There does not appear to be any dispute about what "working configuration" means. Instead, the dispute is whether to add the words "in response to measurement signals from sensor system" to the term as proposed by Defendant.

Defendant argues that in column 5, lines 10 through 13 of the '276 patent, the specification defines this term by implication in stating that "in holding modes as described further below, control logic 140 operates in response to measurement signals from sensor 160 to maintain or acquire a previously identified working

13

configuration." It also refers to Figure 6 and the text describing that figure in columns 10 and 11.

I do not find those passages to constitute a definition. Both of those portions of the specification refer to embodiments. The text in column 5 relates to Figure 1, the other text cited to Figure 6. Although Defendant asserts that there is no embodiment in which the holding or returning of the distal tip to a pose is done passively absent a response to measurement signals, I do not find that the two embodiments clearly limit the invention in the specification such as to evidence an intent to depart from the ordinary meaning of the words as would be required by *Aventis*[, 675 F.3d at 1330]. I will thus not read in the extra sentence Defendant proposes and will give the words their ordinary meaning.

The thirteenth disputed term is "guidance" in claims 1 and 10 of the '601 patent. Plaintiffs offer the construction "directional steering information." Defendant asserts that no construction is needed, or that if one should be required, the term should be construed as "providing directional information to a destination based on a current location."

I will not construe the term at this time beyond its ordinary meaning. It is not clear that there is a real dispute as to the meaning of "guidance." I will, however, allow the parties to raise this in connection with summary judgment if this really becomes an issue.

The fourteenth disputed term is "anatomic landmarks" in claims 1, 2, 3, 10, and 12 of the '601 patent. Plaintiffs assert that no construction is needed, but if that is not the case, then it should mean "anatomic structure." Defendant counters that it means "user-established anatomic features."

I will construe the term to mean "anatomic structure[s] that [are] or [have] been registered and recorded." I will not read in the words "user-established."

The Court's construction is supported by the specification, which does not define the term or clearly require a user to establish the landmark. For example, in the Abstract, it states: "the graphical representations of the vectors point in directions that the endoscope tip is to be steered in order to move towards associated landmarks such as the anatomic structures in a patient." It does not state how the landmarks are established.

14

Similarly, at column 10, lines 25 through 36, the patent again refers to landmarks, but does not reference how they are established.[6]

Also[,] in column 7, lines 44 through 46, the patent refers to "various landmarks along the endoscope's path (e.g., mouth entry, esophagus, stomach entry, and colon)." In column 12, lines 45 through 64, it refers to the esophagus as an anatomic structure. [And in those same lines, the patent refers to the mouth and stomach entry as landmarks.] But in those passages, it does not refer to how the landmark is established.

Defendant does point to embodiments in which the landmark is user-established, but those embodiments again are not sufficiently clear to import that limitation into the term.

The fifteenth and final disputed term is really two terms. First, "freely slidable along the length of the instrument" in claims 1 and 3 of the '056 patent. And second, "guide being slidably disposed without constraint within the lumen along the length" in claims 14, 17, 22, and 32 of the '056 patent.

Plaintiffs assert that no construction is needed, or should the Court determine that construction is appropriate, then these terms should not be construed to mean the same thing. Instead the "freely slidable" term should mean "the elongate guide is freely slidable along the length of the instrument, and the instrument can be advanced without constraint along the guide" and the "slidably disposed term" should mean "the guide can slide without constraint within the lumen along the length of the guide and can selectively support the body of the lumen."

Defendant proposes the same definition for both of the terms, i.e., the "elongate guide is freely slidable and is capable of unconstrained movement along the entire length of the instrument."

---

[6] "The 3-D arrows may also be color-coded so that the color of each arrow is uniquely associated with a particular anatomic structure. For example, referring to FIG. 15, a 3-D arrow 1511 indicating a steering direction towards the mouth entry landmark may be colored red, a 3-D arrow 1512 indicating a 3-D steering direction towards the stomach entry landmark may be colored yellow, and 3-D arrow 1513 indicating a steering direction towards the colon entry landmark may be colored blue. Alternatively, the edges of the display screen 600 may be colored to correspond to landmarks." '601 Patent col. 10, ll. 25-36.

Here, I agree with Plaintiffs that no construction is necessary. The claim language is clear and does not require more. As to Defendant's assertion that there was a disavowal based on the prosecution history, I do not find the statements relied upon to be clear and unambiguous.

First, the Plaintiff[s'] statements in connection with its December 10, 2003 Amendment are not a clear disavowal. Although the language may appear to equate the two phrases in claims 1 and 14, the line in the specification that is cited does have two parts to it and is broad enough to support each of the terms separately.

Similarly, the statements made by the Examiner are not a clear and unambiguous disclaimer. First, it is not apparent that the Plaintiffs acquiesced to those statements. And moreover, the statements are not entirely clear in that the Examiner used the phrase "entire length" in his reasons for allowance, but did include the word "entire" in his amendment to the claims.

_____
The Honorable Maryellen Noreika
United States District Judge

16