13:12:40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


INTUITIVE SURGICAL, INC., and )
INTUITIVE SURGICAL OPERATIONS,)
INC.,                         )
                              )
          Plaintiffs,         )
                              ) C.A. No. 18-1359(MN)
v.                            )
                              )
AURIS HEALTH, INC.,           )
                              )
          Defendant.          )


                    Friday, October 16, 2020
                    1:00 p.m.
                    Teleconference


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge



APPEARANCES:


                    SHAW KELLER LLP
                    BY:  KAREN E. KELLER, ESQ.

                     -and-

                    DURIE TANGRI LLP
                    BY:  ERIC C. WIENER, ESQ.

                    -and-

                    FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
                    BY:  FRANK A. DeCOSTA, III, ESQ.
                    BY:  JACOB A. SCHROEDER, ESQ.

                         Counsel for the Plaintiffs

APPEARANCES CONTINUED:


                    RICHARDS LAYTON & FINGER, PA
                    BY:  KELLY E. FARNAN, ESQ.

                    -and-

                    DESMARAIS LLP
                    BY:  JOHN M. DESMARAIS, ESQ.
                    BY:  PAUL A. BONDOR, ESQ.
                    BY:  JAMIE L. KRINGSTEIN, ESQ.
                    BY:  DEBORAH J. MARIOTTINI, ESQ.


                          Counsel for the Defendant



                    _ _ _ _ _ _ _ _ _ _ _



12:57:32  THE COURT:  Good afternoon, counsel.  Who is

12:57:35  there, please?

13:02:36  MS. KELLER:  Good afternoon, Your Honor.  It's

13:02:39  Karen Keller from Shaw Keller on behalf of Plaintiff,

13:02:42  Intuitive Surgical.  And with me on the line today is Eric

13:02:46  Wiener from Durie Tangri, as well as Frank DeCosta and Jacob

13:02:51  Schroeder from Finnegan.

13:02:54  THE COURT:  Good afternoon to you.

13:02:54  And for Auris?

13:02:56  MS. FARNAN:  Good afternoon, Your Honor.  It's

13:02:58  Kelly Farnan from Richards, Layton & Finger on behalf of

13:03:03 1    Auris.  And I'm joined today from my co-counsel from

13:03:06 2    Desmarais LLP, John Desmarais, Paul Bondor, Jamie Kringstein

13:03:11 3    and Deborah Mariottini.  And we also have a client

13:03:14 4    representative on the line, Michael Timmons.

13:03:17 5             THE COURT:  Okay.  Good afternoon to all of you

13:03:20 6    as well.

13:03:21 7             So we have here another motion to strike

13:03:24 8    portions of a Dr. Prowse report, this time it's his reply

13:03:30 9    report.  And the requested to strike his new calculations of

13:03:33 10   lost profits and his reliance on a technical expert

13:03:37 11   regarding comparability of technology and licenses.  I have

13:03:43 12   read all of the papers including the exhibits attached, or

13:03:47 13   at least the relevant portions of the exhibits attached and

13:03:50 14   I would like to hear argument on the issues one at a time.

13:03:53 15   First the new lost profits analysis, I'll hear first from

13:03:58 16   Defendant.  Who is going to argue that?

13:04:00 17            MR. BONDOR:  Your Honor, Paul Bondor on behalf

13:04:03 18   of Auris.  I'll be speaking today for the Defendants.

13:04:06 19            THE COURT:  Okay.

13:04:08 20            MR. BONDOR:  Your Honor, in past conferences you

13:04:11 21   have mentioned your bright-line rule if it's not timely

13:04:12 22   disclosed you don't get to use it at trial.  As we noted we

13:04:16 23   set out two specific areas where Intuitive disregarded your

13:04:21 24   scheduling orders to introduce brand-new theories and

13:04:25 25   information in the reply report.  And Plaintiff, Intuitive,

has the burden to prove damages.  In this case, Intuitive

seeks about $150,000,000 in reasonable royalties --

THE COURT:  I read the papers, I know, and I

read the report and how much they're asking and lost

profits, but just get right to the issue here, tell me why.

MR. BONDOR:  Certainly.

THE COURT:  Their position is you didn't ask for

it and so we gave you what you asked for and, you know, we

don't have to give you more, so you can't really claim

surprise.  Tell me why that's wrong.

MR. BONDOR:  Okay.  First of all, it is

absolutely incorrect to say that we never asked for it.  We

did ask for it.  It's not even a credible assertion.  The

materials were covered by multiple discovery requests, rules

and the Court's own scheduling order.  I mean, first and

foremost the scheduling order required disclosure of all the

opinions and the basis therefore in their opening reports

for every issue on which they had the burden of proof.

We're happy -- I mean, there are so many that it's

voluminous, but we would be happy to provide the Court with

a complete list if it would be helpful, but just by way of

example, interrogatory number 8 sought disclosure of all

facts and reasons for any claim of damages, including

specifically lost profits.  It asked for all identification

of all associated costs and gross revenues and net profits

in units and dollars.  Intuitive's response called it premature and pointed to timing of expert discovery and promised to submit an expert report detailing their claim.

In addition to that we have the requirements of the initial disclosures under Rule 26, they require computation of damages, disclosure of documents and evidentiary material on which any computation is based and the names of people with discoverable information.  You're supposed to provide that even independent of any discovery requests.

But in addition to those things we also had numerous document requests.  Again, the list goes on and on, but that goes specifically for request number 80 which is documents supporting or refuting any claim for damages; 81, documents showing sales revenues and profits; 82, documents sufficient to show profitability.  And there are more and more of them.  But on top of that we also had depositions, both 30(b)(6) and individual, of company representatives Jones and Patton and supplemental discovery on Moses.  So unambiguously, not only did we ask for it, not because this is a matter on which they bear the burden of proof, it was incumbent upon them in compliance with Your Honor's scheduling order to come forward with all of their theories for lost profits and all of the evidence on which they relied.

13:07:08 1          These two new theories, I want to focus on the

13:07:11 2 fact that they are indeed brand-new theories.  It is not

13:07:15 3 just a new calculation, it is not simply responsive to

13:07:19 4 something that we did in our reports.  So in their opening

13:07:24 5 report, Dr. Prowse very specifically treated the two

13:07:29 6 Plaintiffs together.  The two Plaintiffs are Intuitive

13:07:33 7 Surgical, Inc., we call them ISI --

13:07:35 8          THE COURT:  I get it.  ISI and ISO.  I

13:07:40 9 interrupted you not because I wanted to show you that I read

13:07:43 10 your letter, but because I wanted to -- I think that there

13:07:46 11 is sometimes folks refer to them as different things.  In my

13:07:49 12 head because I read your letter first, I have them as ISI

13:07:53 13 and ISO, so I would appreciate if everybody referred to them

13:07:57 14 that way.

13:07:58 15          MR. BONDOR:  Wonderful.  Thank you, Your Honor.

13:08:00 16 I'll continue to do that.

13:08:03 17          So in his opening report, he specifically treats

13:08:06 18 both of the Plaintiffs together.  There is no doubt about

13:08:09 19 it.  There is no dispute about it.  I point Your Honor to

13:08:12 20 paragraph 71 in the Mariottini declaration Exhibit 5, but he

13:08:17 21 treats the lost profits question as consolidated between the

13:08:21 22 two entities.  In fact, throughout his entire report he

13:08:24 23 makes no distinction between the two, he refers to them all

13:08:28 24 as Intuitive.  He will tell us that's because he assumed

13:08:31 25 that all profits inextricably flowed to ISO.  We neither

think that's true and we don't think that it's proven, but
in any event, that was the position that he took in his
opening report.

There was no mention of any legal or factual
theory separating out a patent owner's profits.  There was
no mention of any intercompany transfers or arrangements
that supposedly relate to any distinction between the two
plaintiffs.  That's not surprising, Your Honor, because
Intuitive produced no information in the case that said any
of those things, not in interrogatory responses, not in
documents, not the deposition.  Our damages expert responded
to that opening report as you might expect, she opined that
there were no lost profits.

She pointed out that Dr. Prowse didn't isolate
any amounts specific to the patent owner as the law required
and she made various criticisms of his view of this but for
world, this part of the lost profits analysis, including
market dynamics, ignoring the reality of COVID impacts,
ignoring the timing of Intuitive's product introduction.

But in Intuitive's reply report for the first
time, Intuitive's expert Prowse offered two brand-new
theories on brand-new undisclosed information.  Again, there
is no dispute about the fact that it's brand-new, it's set
out in five specific paragraphs there in the Mariottini
declaration Exhibit 1.  First, in paragraphs 247 and 248, he

13:10:03 1   asserts for the first time that after ISOP sells products to

13:10:07 2   ISI, that later there is some reconciliation process that

13:10:12 3   leaves ISI with quote, a typically 1 to 4 percent operating

13:10:17 4   margin.  That's what he says.  So the first time in his

13:10:20 5   reply, he sets out a legal theory, now this is supposedly

13:10:25 6   ISOP's profit and then he for the first time calculates a

13:10:30 7   new lost profits number using this what we'll call a

13:10:33 8   reconciliation process theory.

13:10:36 9           The second instance in paragraphs 249 to 251, he

13:10:41 10  offers a second new theory.  In this one, he assumes that

13:10:45 11  ISOP makes discounted sales to ISI and he uses that assumed

13:10:51 12  discounted revenue to come up with another number that he

13:10:54 13  says is representative of ISOP's profits.  We call that the

13:10:59 14  discounted sales theory.

13:11:01 15          Now neither of those two new theories, not the

13:11:05 16  reconciliation process theory, not the discounted sales

13:11:08 17  theory, they are not responsive modifications of

13:11:11 18  calculations.  They're brand-new legal theories.  They're

13:11:14 19  offered as new and different ways to calculate lost profits.

13:11:18 20  And they're based on brand-new factual information that was

13:11:22 21  never disclosed in the opening reports and never previously

13:11:25 22  disclosed at any point in the litigation.

13:11:27 23          Now I know --

13:11:28 24          THE COURT:  Tell me -- and I read the

13:11:32 25  deposition, the excerpts of the deposition of Ms. Moses that

were sent to me and about all the questions of what the
margins are between ISI and ISOP and whether they were the
same or different and how that worked and she didn't know
that.  Were there questions asked about the distribution
agreement and any changes that had been made to that?

MR. BONDOR:  Well, so I don't recall that Moses
was asked about the distribution agreement.  And that's not
surprising.  Because although Intuitive now asserts that
hey, this is reliant on a document, the Intuitive
distribution agreement, in fact Dr. Prowse's opening report
doesn't cite the distribution agreement at all.  And all of
these new theories don't appear in the distribution
agreement.  As a matter of fact, the distribution agreement
to the extent that it has anything at all about
distributions between the parties, Dr. Prowse in his opening
theory, or rather it talks entirely about a different scheme
for transfer pricing that Prowse entirely ignores.  As a
matter of fact, at his deposition Dr. Prowse confirmed that
he doesn't cite the distribution agreement in his opening
report, and it is not enlisted in the materials considered
for his opening report.

In point of fact, these theories, the new
theories are inconsistent with what the distribution
agreement says and you know that that's true because in
Dr. Prowse's reply reports, he actually states in

paragraph 247 citing a discussion with Moses that Intuitive as a group no longer does what the Intuitive distribution agreement says, but instead comes up with this new true up or reconciliation scheme.

So when Ms. Moses was deposed, and Ms. Moses was deposed as part of the supplemental discovery that Your Honor permitted after all of this stuff came out for the first time in his opening reports, we deposed Ms. Moses on all of the spreadsheets on which she relied, and we compared them with the only other spreadsheet that they had ever produced relating to revenues and profits. Now, we did ask her whether any of those spreadsheets discriminated between ISOP's profits versus ISI profits and she confirmed on multiple occasions as Your Honor sees from the transcript that she had absolutely no knowledge of that fact. But to answer Intuitive's assertion that well, we should have asked her about nonconsolidated profit sheets, first of all, there were no nonconsolidated profit sheets that were ever produced in the litigation. And our deposition of Ms. Moses was taken in direct response to their opening expert report and their opening expert report made no distinction between the two entities. There was absolutely no reason for us to seek additional witnesses or preparation of additional witnesses to separate out the profit between them --

THE COURT: Okay. And I apologize, the phone

13:15:02 1    doesn't always kick over immediately, so if you breathe

13:15:05 2    every once in a while, Mr. Bondor, it would help me to ask

13:15:08 3    questions.

13:15:08 4                MR. BONDOR:  I'm sorry, Your Honor.  I

13:15:10 5    apologize.

13:15:11 6                THE COURT:  That's okay.  Just the limits of our

13:15:15 7    system here.  It's not your fault.

13:15:17 8                But if I were to agree with you and strike

13:15:21 9    paragraphs 247 through 251 and the new part, I need to

13:15:29 10   understand for purposes of understanding the importance of

13:15:35 11   the information, prejudice, things that I need to address in

13:15:40 12   making this ruling, what is going to happen?  Does that mean

13:15:44 13   lost profits are out or does that mean they're stuck with

13:15:48 14   the lost profit that they asserted in the opening report

13:15:53 15   which seems like it's a number that's about $30 million or

13:15:57 16   20 to $30 million higher than the current one.  So tell me

13:16:04 17   -- I already know what happened when I allowed the

13:16:06 18   deposition to go forward the last time you moved to strike,

13:16:09 19   now tell me what happens if I don't allow anything in

13:16:12 20   connection with this motion to strike.

13:16:12 21               MR. BONDOR:  Yes, Your Honor.

13:16:16 22               If you grant our motion to strike, then they

13:16:20 23   will be left with their lost profits theory as set forth in

13:16:24 24   the opening report.

13:16:26 25               THE COURT:  And that's subject to your motion

13:16:31 1  for summary judgment saying it's not appropriate because it

13:16:35 2  doesn't have -- it doesn't ask for lost profits from the

13:16:40 3  correct entity; right?

13:16:43 4          MR. BONDOR:   That is correct, Your Honor, yes.

13:16:46 5          THE COURT:   And if I were to deny that motion

13:16:48 6  for summary judgment, then they would have to go forward on

13:16:52 7  their theory in the opening report subject to

13:16:57 8  cross-examination as to why it's wrong and response from

13:17:00 9  your expert or something else?

13:17:02 10         MR. BONDOR:   I think that they would do exactly

13:17:06 11 as what you just described.   I think that, of course, it's

13:17:11 12 our view that because that theory as set forth and the facts

13:17:15 13 on which that theory is set forth and based are legally

13:17:19 14 insufficient that at some point whether it turns out to be

13:17:24 15 summary judgment or it turns out to be judgment as a matter

13:17:27 16 of law, that theory and those facts will not be able under

13:17:31 17 any -- for any reasonable juror, they won't be sufficient to

13:17:35 18 prove the patent owner's damages, and so down the road I

13:17:40 19 think ultimately they will not be able to prove their lost

13:17:42 20 profits damages.   But if you were to grant our motion to

13:17:47 21 strike as requested, they would be left ostensibly with

13:17:52 22 their first theory of lost profits.

13:17:55 23         I will observe, though, for the Court that they

13:17:58 24 have abandoned that theory, and they have abandoned that

13:18:02 25 theory if, in fact, in the summary judgement and Daubert

13:18:07 1    briefing they are relying entirely on the two new things

13:18:13 2    that they -- two new theories that they first put forward in

13:18:18 3    the reply reports.  So yes, they would be left with their

13:18:21 4    first theory.  They've already run away from it and

13:18:24 5    abandoned it in writing, so whether they would persist with

13:18:28 6    that legally deficient theory or not is not really a

13:18:32 7    question for me, but yes, if they chose to try to make new

13:18:38 8    law they could rely on that.

13:18:40 9              THE COURT:  Let me hear from the Plaintiffs.

13:18:43 10   Who is going to respond?

13:18:45 11             MR. WIENER:  Thank you, Your Honor.  This is

13:18:47 12   Eric Wiener for Intuitive.  I first just with a housekeeping

13:18:52 13   matter, I would like to make a request on the record that we

13:18:55 14   would like to review the transcript from this hearing to see

13:18:59 15   whether or not anything needs to be redacted.  There is

13:19:03 16   likely fairly sensitive profit issues that are going to be

13:19:06 17   discussed and have already been discussed and we'll file the

13:19:09 18   appropriate motion afterwards.

13:19:11 19             THE COURT:  I will give you a very short period

13:19:14 20   of time to do that, but okay.

13:19:17 21             MR. WIENER:  Thank you, Your Honor.

13:19:18 22             Your Honor, there is a lot that Mr. Bondor

13:19:21 23   covered so I will try my best --

13:19:24 24             THE COURT:  Right.  What I need to understand is

13:19:28 25   where -- I'm not going to agree with you that this was never

asked for because it seems to me you had the burden of proof
on damages, you needed to show that the damages, lost
profits damages were from ISOP, you had to produce the
documents that would be used to show that and at least give
them some understanding that you were going to be making
that assertion.

I don't think there is anything in Dr. Prowse's
opening report on that.  And then he came in and he really
did redo his lost profits as I see it to address a
criticism.  And, you know, this isn't the typical kind of
way you address a criticism in a reply report saying oh, it
doesn't matter, or yeah, I corrected that arithmetic error
or oh, yeah, I included a few wrong sales and I'll take
those out.  This is a pretty new theory.  And it's not a
straightforward theory.  I got to tell you, I read those
paragraphs many times, and you know, it's kind of
convoluted.  So how is it that you think in a reply report
he can come in and disclose something that was not
previously disclosed?

MR. WIENER:  Thank you, Your Honor.  This is
Eric Wiener for Intuitive.

Your Honor, Dr. Prowse did include in his
original report a theory regarding lost profits suffered by
ISOP.  The paragraph that Mr. Bondor cited to is included in
both of the declarations.  Paragraph 71 concludes that the

13:21:06  1    profits suffered by ISOP are the profits suffered by both

13:21:10  2    Intuitive and ISI and in coming to that conclusion,

13:21:14  3    Dr. Prowse relied on deposition testimony from Mr. Patton

13:21:17  4    who testified during discovery that the money went back to

13:21:21  5    ISOP.  So to say that there was not a theory in the original

13:21:26  6    report about what ISOP's profits were is not a correct

13:21:31  7    theory --

13:21:32  8             THE COURT:  I'm sorry, I'm sorry, but that's a

13:21:34  9    different theory than what he's now arguing; right?

13:21:39 10             MR. WIENER:  Well, no, Your Honor, I would say

13:21:41 11    it's a different calculation.  In his original report he was

13:21:44 12    saying that because based on record testimony, based on

13:21:47 13    Mr. Patton's deposition, he concluded that 100 percent of

13:21:50 14    the profits went to ISOP.  He then read Ms. Dean's report

13:21:55 15    where she criticized his opinion, she pointed to other

13:21:58 16    record evidence that was intentioned with the conclusion

13:22:01 17    that 100 percent of the lost profits went to ISOP.  And she

13:22:05 18    conducted her own model based on the distribution agreement

13:22:08 19    and other documents.  He considered that criticism where she

13:22:12 20    said that he got it wrong that it's not a hundred percent

13:22:12 21    that goes to ISOP.  He looked at the documents she cited.

13:22:16 22    He conducted an investigation.  And he determined that it

13:22:22 23    would be appropriate to make an adjustment to his

13:22:25 24    calculation of four percent discount to his 100 percent

13:22:28 25    approach that he took in the opening report.  And that is

the main calculation that he offers in his reply.  It is a different calculation and an adjustment, a very minor adjustment to his original calculation 100 percent, but it is not a new theory.  It is still presenting the theory of the profits that the patentholder ISOP lost.

THE COURT:  And was there any place during discovery that the four percent discount was disclosed?

MR. WIENER:  No, Your Honor.  And because although Mr. Bondor recites a lot of different document requests and interrogatories, they never asked for that.  The question of what -- how does the distribution agreement work and how are the profits falling.  In fact --

THE COURT:  Right.  But you produced a distribution agreement, and as I understood what was being said was that the distribution agreement says one thing, but then at some point, perhaps after the deposition, Ms. Moses found out that how it works has changed a little bit and now there is this two-step process and well, how -- I mean, it's not Defendant's burden to come back and say here are the ways that we think you're going to screw up a lost profits calculation, let us make sure we understand it.  I mean, if you wanted to come forward and say that it was somehow based on the discount, don't you have to produce that?

MR. WIENER:  Your Honor, first of all, we did produce the distribution agreement and we also produced a

13:24:04 1   witness who provided testimony on the distribution agreement

13:24:07 2   back in January.  That was Dr. Jones.  He was asked

13:24:12 3   questions about the distribution agreement, but didn't ask

13:24:14 4   him how it was being used in allocating profits currently.

13:24:18 5   It wasn't a question that was posed to him and it wasn't

13:24:20 6   Intuitive's burden to provide information and details about

13:24:24 7   the --

13:24:24 8        THE COURT:  Wait.  Let me just ask you.  At any

13:24:27 9   point in his deposition or in any documents that were

13:24:30 10  produced, was there any hint that this agreement was not

13:24:34 11  being followed currently by -- that there had been changes

13:24:39 12  made?  I'm just trying to figure out what is fair to ask the

13:24:44 13  Defendants to be figuring out, the questions to ask, if you

13:24:49 14  just give them an agreement and you say here we're going to

13:24:52 15  give you a witness on the agreement and they don't say okay,

13:24:55 16  have any changes been made to this that weren't produced to

13:24:58 17  us, I don't know, that seems like you're putting the burden

13:25:01 18  on them rather than on you.

13:25:05 19       MR. WIENER:  I understand, Your Honor.  And let

13:25:06 20  me address that.  First of all, the distribution agreement

13:25:09 21  which was from 2010, in the portion where it identified the

13:25:13 22  intercompany pricing makes clear that the pricing that it is

13:25:16 23  explaining and setting forth in the agreement is an initial

13:25:19 24  set of pricing and that was ten years ago.  Additionally,

13:25:23 25  Intuitive did produce a spreadsheet that provided

13:25:27 1    intercompany transfers of money in connection with sales of

13:25:31 2    the DaVinci and Ion products.  And based on that information

13:25:37 3    it is clear that the -- the specific calculation of prices

13:25:40 4    that was identified in the exhibits in the 2010 distribution

13:25:45 5    agreement was out of date, and it seemed identified as such

13:25:49 6    and says that in her report.

13:25:51 7            There was record evidence that the specific

13:25:54 8    approach followed in the 2010 pricing agreement was out of

13:25:59 9    date and the document itself would suggest that that was an

13:26:02 10   initial approach in any event.  And again, Dr. Prowse then

13:26:07 11   relied on the deposition testimony from Taylor Patton where

13:26:10 12   he testified that the money went back to ISOP in his

13:26:13 13   original report.

13:26:14 14           Now, from that position, he meets the initial

13:26:19 15   burden to determine what ISOP's profits were that was met in

13:26:23 16   the initial report, he calculated it at 100 percent and took

13:26:27 17   Ms. Dean's criticisms into account, determined what the

13:26:31 18   current situation is in terms of the application of the

13:26:35 19   distribution agreement, again, all in considering her

13:26:38 20   criticism, she wasn't -- criticisms to his approach and

13:26:42 21   methodology and said he was looking into that and he

13:26:42 22   determined that a minor four percent modification to his

13:26:49 23   calculation was appropriate.  But it was all in response to

13:26:51 24   her criticisms of his conclusions based on record evidence

13:26:55 25   that it was 100 percent of the profit that would go to ISOP.

13:27:04 1          I would like to turn briefly to some of the

13:27:07 2   areas that Mr. Bondor claims they sought this information in

13:27:11 3   discovery.  Your Honor, Rule 37 only prevents parties from

13:27:17 4   using at trial information that was improperly withheld or

13:27:21 5   not disclosed under Rule 26(e).  And Mr. Bondor identified a

13:27:25 6   lot of areas of discovery and this is all new to us, this

13:27:28 7   was not identified in the letter or in the meet and confers.

13:27:32 8          I will say that with respect to the

13:27:33 9   interrogatory that he points to, the general contention

13:27:37 10  interrogatory for providing all the bases for damages,

13:27:41 11  Intuitive and Mr. Bondor identifies that it would provide

13:27:45 12  those bases through its expert reports, which it did, and

13:27:50 13  Auris did not move for an earlier disclosure.

13:27:52 14          With respect to the deposition testimony,

13:27:55 15  Ms. Moses in particular, she was identified as a company

13:27:59 16  witness to provide testimony on particular spreadsheets.

13:28:03 17  Now those spreadsheets did not address this intercompany

13:28:08 18  profit allocation issue, it was not fairly from the scope of

13:28:12 19  the testimony, as you can see from the responses that she

13:28:14 20  provided, she was not asked how the profits were allocated

13:28:19 21  between the two, ISI and ISOP, with respect to Ion sales.

13:28:24 22  She was asked questions about the specific spreadsheets and

13:28:28 23  she did not know whether the specific spreadsheets she was

13:28:33 24  looking at had ISI or ISOP --

13:28:35 25          THE COURT:  Were any documents ever provided

that showed the breakdown of the profits between ISI and

ISOP?

       MR. WIENER:  You know, I think there were a lot

of documents produced that provide the general Ion margin

information.  I don't know of a particular document that --

the document would be the true up aspect, the reconciliation

aspect of this.  And Intuitive could provide those documents

now, but we're not seeking to produce a document to show

that -- this is not a situation where we're trying to rely

on a late produced document, it is information that explains

how the 2010 distribution agreement which was produced

during document discovery, how it is currently being

implemented.  And that is a question of discovery that Auris

pursued during fact discovery at least with respect to how

the profits are being allocated in a way that would have

required a disclosure of the four percent true up.  Had they

thought that and had we provided that information it likely

would have been included in the initial -- in the initial

calculation by ISOP.

       THE COURT:  Okay.  Anything else?

       MR. WIENER:  Yes.

       And finally, turning to the issue of the

prejudice here, as Mr. Bondor makes clear in what he's

saying, the results of striking the reply report would be

that Dr. Prowse would not be able to respond to criticisms

13:30:15 1    about how he distinguished between -- how he calculated the

13:30:21 2    portion of Intuitive's overall profits that were lost

13:30:24 3    profits that would have been suffered by ISOP.  Ms. Dean

13:30:29 4    levied an attack on his approach and provides evidentiary

13:30:33 5    support for that, however, she does not conduct a

13:30:36 6    calculation or model that is consistent with how Intuitive

13:30:39 7    actually allocates the profits between the two --

13:30:42 8             THE COURT:  Because she didn't have that

13:30:44 9    information to do it; right?

13:30:47 10            MR. WIENER:  I understand.  But now in talking

13:30:50 11   about the *Pennypack* factors, we're assuming that she should

13:30:55 12   have received that and the question is what the correct

13:30:59 13   approach would be at this point, you know, if this is

13:31:05 14   stricken as opposed to other potential --

13:31:08 15            THE COURT:  Tell me how you think that we could

13:31:11 16   fix this at this stage when I have dispositive motions

13:31:18 17   already filed, expert discovery and depositions have been --

13:31:22 18   look like it's pretty much over.  It sounds like there are

13:31:26 19   documents out there that haven't been produced.  What is it

13:31:30 20   that you think that we should do and how that would not

13:31:35 21   cause us problems going forward?

13:31:38 22            MR. WIENER:  Sure, Your Honor.  And to be clear,

13:31:42 23   it's our position that there was --

13:31:45 24            THE COURT:  You're not going to -- I don't think

13:31:45 25   you're going to succeed on the nothing should be done.

13:31:54 1    Let's say I'm willing to think about what could be done to

13:31:57 2    cure the prejudice, and it seems like there is a lot, tell

13:32:02 3    me what it is that could be done.

13:32:05 4              MR. WIENER:  All right, Your Honor.  First of

13:32:08 5    all, given that the trial is now about eight months away,

13:32:12 6    it's like --

13:32:13 7              THE COURT:  I'm not asking -- wait, wait, I have

13:32:16 8    seven motions, dispositive motions, Daubert motions, all

13:32:22 9    kinds of stuff, thousands of pages, already briefed in front

13:32:25 10   of me.  I need time to deal with this.  You guys agreed to

13:32:29 11   extend the trial date on the representation that none of

13:32:34 12   that would change.  So I get it, the trial date is off, but

13:32:40 13   how is it that we're not going to screw up that trial date

13:32:43 14   by now screwing up the pretrial motions, the dispositive

13:32:50 15   motions that I have in front of me?

13:32:52 16             MR. WIENER:  Your Honor, I would say that

13:32:54 17   denying the motion but putting in place some other approach

13:32:58 18   to curing Auris' prejudice would not create prejudice with

13:33:04 19   respect to the current summary judgement motions.  Auris has

13:33:08 20   already filed summary judgement motions on this issue.  It's

13:33:12 21   not like this opinion seeking relief from the Court on the

13:33:16 22   lost profit issues, it had multiple grounds on which it

13:33:20 23   moved and sustaining or allowing Dr. Prowse to provide this

13:33:22 24   testimony and allowing Intuitive to provide information

13:33:27 25   regarding the true up payment would be relevant to that lost

13:33:30  1   profits motion, but certainly wouldn't make it mute or won't

13:33:33  2   mean there are some other grounds on which they would have

13:33:36  3   moved that they wouldn't move.

13:33:38  4            I don't think there is prejudice with respect to

13:33:40  5   the summary judgement motion that Auris would face as we

13:33:43  6   explained in our letter, giving the timing of the current

13:33:46  7   financial data, it's likely that before trial there would be

13:33:49  8   a supplementation of a financial data, Intuitive could

13:33:52  9   provide the additional information.  And I just want to be

13:33:56 10   clear, I'm not aware that there are necessarily specific

13:33:58 11   documents that document the four percent.  We didn't want to

13:34:01 12   produce documents late as a result of this, so that's not

13:34:05 13   something I am sure one way or the other, but we could look

13:34:09 14   for that kind of documentation and provide it to Auris and

13:34:12 15   provide a witness so that Auris can test and verify

13:34:17 16   Dr. Prowse's supplemental calculation on the ISOP profit

13:34:21 17   calculation.  And then have their expert, Ms. Dean, have an

13:34:27 18   opportunity to with that information rebut Dr. Prowse's

13:34:30 19   approach with the documents and potentially a short

13:34:34 20   deposition on this issue.  It would be a fairly narrow

13:34:38 21   issue.  And while it's complicated from a financial

13:34:41 22   perspective, it is something that a single witness probably

13:34:44 23   with a partial day deposition could provide Auris whatever

13:34:49 24   additional information it thinks it was entitled to receive

13:34:52 25   earlier.

13:34:52 1          And that would put it back to where it would

13:34:55 2 have been had this information been disclosed in the

13:34:58 3 original Prowse report.  Which in contrast if you're looking

13:35:01 4 at the prejudice would be to excluding or striking this

13:35:05 5 information from Dr. Prowse, you heard from Mr. Bondor,

13:35:09 6 Auris thinks this information and this adjusted calculation

13:35:12 7 is stricken that it means that Intuitive will not be able to

13:35:15 8 seek lost profits at all.

13:35:17 9          Now --

13:35:18 10          THE COURT:  Right.  But you told me that in his

13:35:21 11 opening report, Dr. Prowse had a theory on profits, lost

13:35:26 12 profits for ISOP; right?  The only difference here is that

13:35:32 13 -- you're saying that he just needed to reduce that by four

13:35:34 14 percent?

13:35:37 15          MR. WIENER:  Correct, Your Honor.  I think there

13:35:38 16 is maybe two issues here.  One is whether we're talking

13:35:42 17 about excluding Dr. Prowse from providing the expert

13:35:47 18 testimony in his reply report which is the subject of their

13:35:50 19 motion, and the second would be whether Intuitive would be

13:35:54 20 precluded from presenting any information for the four

13:35:59 21 percent reconciliation.  I understand this conversation and

13:36:02 22 this motion to be directed at Dr. Prowse's opinion, and in

13:36:06 23 that context if this motion to strike were granted, he would

13:36:12 24 be limited to providing his 100 percent allocation that he

13:36:16 25 provided in his opening report and would be unable to

13:36:19  1    respond to Ms. Dean's lengthy attacks regarding that

13:36:24  2    allocation, and unable to provide information that he

13:36:27  3    received that shows that Ms. Dean's approach was incorrect.

13:36:32  4    And that would have obviously material affects on our

13:36:35  5    ability to present through our expert our lost profits

13:36:40  6    scheme.

13:36:41  7            THE COURT:  Mr. Bondor, let me hear from you.

13:36:44  8    I'll give you one minute because we have already been

13:36:47  9    talking for thirty-five on this issue, one minute, just tell

13:36:50 10    me about the prejudice and ability to cure the prejudice and

13:36:54 11    why that factor of the *Pennypack* goes in your favor.

13:37:00 12            MR. BONDOR:  Certainly, Your Honor.

13:37:02 13            Basically if Intuitive were allowed to add this

13:37:07 14    new information and this new theory to the case at this date

13:37:11 15    we would have to reopen fact discovery.  There would have to

13:37:14 16    be additional factual depositions, certainly Ms. Moses, also

13:37:18 17    whoever she got this information from, because we still

13:37:21 18    don't know who that is.  To this day we have no idea where

13:37:24 19    this information came from.  There could be other witnesses

13:37:27 20    who may have conflicting information.  We would have to redo

13:37:30 21    the Prowse deposition on the basis of that record.  We would

13:37:33 22    have to do redo all the responsive expert reports of our own

13:37:37 23    based on that record.  We would have to rebrief and redo all

13:37:41 24    of the damages related motions for summary judgement to the

13:37:45 25    Daubert motion which would be to adjust for the new record,

13:37:47 1    and, you know, we have been down this road once before.

13:37:50 2         There is no guarantee that they're not going to

13:37:53 3    find some other brand-new information that isn't recorded

13:37:56 4    and that's never been disclosed in any discovery response,

13:37:58 5    any document or any deposition and we would recycle again.

13:38:03 6    And at this point the prejudice is severe to both the

13:38:06 7    parties having to redo all that work and to Your Honor

13:38:09 8    because you already have in front of you fully briefed and

13:38:12 9    pending the motions for summary judgement and that was all

13:38:16 10   pursuant to your scheduling order from back in March of

13:38:20 11   2019.  It's ridiculous to ask us to do this again, and none

13:38:24 12   of this information was disclosed.

13:38:25 13        THE COURT:  Now I want to hear on the comparable

13:38:29 14   licenses.  Mr. Bondor, is that you?

13:38:34 15        MR. BONDOR:  It is, indeed, it is me again.  In

13:38:37 16   the second instance, again, the fundamental problem is that

13:38:44 17   they did not accord themselves or they didn't honor Your

13:38:50 18   Honor's scheduling order.  Basically, in Prowse's opening

13:38:54 19   damages analysis, he relies on these licenses between

13:38:58 20   Intuitive and Schoelly.  As Plaintiff, it's Intuitive's

13:39:02 21   burden to prove technical comparability for the licenses on

13:39:07 22   which they intend to rely.

13:39:09 23        In his opening report, Prowse took it upon

13:39:12 24   himself without any technical training or expertise simply

13:39:16 25   to decide that the technology at issue in the Schoelly

agreement is technically comparable to the technology in the patents-in-suit, that's in the Mariottini declaration, Exhibit 6 at paragraphs 261 and 265.  He unambiguously states it's his own conclusion.  He doesn't cite to anyone or rely on anyone else.  At his deposition he confirmed that he had not discussed it with anyone else for his opinion in the report.  That was the full universe of materials on which they were relying and planning to rely on this idea of technical comparability.  And that's a choice that they made.

Dr. Prowse had talked to Dr. Choset about multiple other things.  There are lots of other citations to conversations he had with Dr. Choset on other issues, but they chose, they made a strategic choice to have Dr. Prowse be the one to bear this burden on their behalf with respect to technical comparability.  And again, it's their burden.

So in our response, in our opposition submissions, your technical expert who is skilled in the relevant technology examined the patent and the products at issue in the Schoelly licenses and he pointed out in his responsive report that neither the technology nor the licensed products were technically comparable.  And our damages expert, Ms. Dean, timely relied on that information from Dr. Alterovitz.  Again, that give and take was what was instructed by Your Honor's scheduling order.  They were to

13:40:53 1    open on issues that they had the burden, we were to respond

13:40:56 2    and we did.

13:40:57 3           So then in a reply report, despite not having

13:41:02 4    addressed it in his opening report for the first time,

13:41:05 5    Dr. Choset then sets out a new analysis of the Schoelly

13:41:09 6    technology, and then in his reply damages report for the

13:41:14 7    first time Dr. Prowse claims to rely on that tardy

13:41:17 8    Dr. Choset opinion.

13:41:18 9           So instead of complying with your scheduling

13:41:21 10   order in which Intuitive lays out its damages case as

13:41:25 11   ordered including its theories, including the matters on

13:41:27 12   which it bears the burden of proof including technical

13:41:31 13   comparability and we get to respond to that case as it's

13:41:35 14   laid out, and you know, I observed that the whole point of

13:41:38 15   the scheduling order is to help the Court narrow issues for

13:41:42 16   trial.

13:41:43 17          So we have all the factual discovery, all of the

13:41:45 18   facts are up in the air, the expert reports at a time when

13:41:50 19   both parties lay their cards on the table and the case

13:41:54 20   necessarily narrows.  They make choices, what are they going

13:41:57 21   to assert, what damages are they going to request and what

13:42:01 22   are they going to rely on and we make choices --

13:42:04 23          THE COURT:  Let me hear from the Plaintiff.

13:42:06 24   Mr. Wiener, is this your issue, too?

13:42:08 25          MR. WIENER:  Yes, it is, Your Honor.  Thank you.

13:42:10 1                    THE COURT:  Okay.  Here is my first question.

13:42:16 2        How is this going to be used at trial?  Would you now given

13:42:22 3        that this came up in a reply report from Dr. Choset, you're

13:42:31 4        not planning to put Dr. Choset in your case-in-chief to say

13:42:34 5        these are comparable; right?

13:42:37 6                    MR. WIENER:  Your Honor, I think we would likely

13:42:39 7        put Dr. Prowse on in our case-in-chief to say that these are

13:42:43 8        comparable and he can explain that he relied on Dr. Choset

13:42:46 9        and information that he received from Dr. Choset on that,

13:42:50 10       and should Auris in their rebuttal case put on their

13:42:54 11       technology experts and provide the testimony and the opinion

13:42:57 12       that Dr. Alterovitz provided, then Dr. Choset in reply would

13:43:02 13       be entitled to respond to those and provide as a witness on

13:43:05 14       the stand the testimony that he provided in his reply report

13:43:08 15       which is the proper province of a reply report.

13:43:15 16                   THE COURT:  Would Dr. Prowse be able to say in

13:43:17 17       your case-in-chief that he relied on Dr. Choset, or would he

13:43:21 18       just be able to say look, I looked at these and I think

13:43:24 19       they're comparable, and then you would later hear -- later

13:43:29 20       if he were questioned on that, what I'm trying to figure out

13:43:33 21       is why should Dr. Prowse be able to say in your

13:43:38 22       case-in-chief something that wasn't in his expert report,

13:43:41 23       his opening expert report that you waited on until reply?

13:43:46 24                   MR. WIENER:  Your Honor, I think the cases out

13:43:48 25       there are clear that in reply reports you can expand on the

13:43:53 1    basis and the evidence that you use to support your original

13:43:56 2    opinions that responds to an opposing expert in rebuttal,

13:44:02 3    and that's what we have here.

13:44:03 4              THE COURT:  So does that mean that Dr. Prowse

13:44:06 5    actually spoke with the Dr. Choset before his opening report

13:44:13 6    to get if not, you know, a specific report from Dr. Choset,

13:44:18 7    but that he talked to him and he said yeah, yeah, these are

13:44:22 8    comparable technologically?

13:44:25 9              MR. WIENER:  No, Your Honor, he spoke to

13:44:27 10   Dr. Choset before his initial report to get an understanding

13:44:30 11   of the patents-in-suit and the technology there, which is a

13:44:34 12   component of the technical comparability analysis to the

13:44:39 13   Schoelly agreement as he explained in the deposition.  So to

13:44:42 14   a certain extent he did, he learned and got an understanding

13:44:45 15   from the technical expert about the patents-in-suit and

13:44:48 16   Dr. Prowse himself cited to in his original report evidence

13:44:52 17   regarding the licensed product from Schoelly, the Einstein

13:44:57 18   Vision System as well as Real Viewing and the licensed

13:45:00 19   patents from the Schoelly license agreements as well, and

13:45:02 20   came to the conclusion that they were sufficiently

13:45:02 21   comparable for his use.

13:45:02 22             THE COURT:  And just so I understand, if in the

13:45:12 23   trial Dr. Prowse gets on the stand and says I relied on

13:45:12 24   Dr. Choset to say that they were comparable, you would be

13:45:20 25   okay with Defendants coming in and saying, uh, just so we're

13:45:24 1    clear, you told us on whatever date when you filed your

13:45:27 2    expert report they were comparable, you never asked

13:45:30 3    Dr. Choset about that before you came up with that

13:45:33 4    determination, you would be okay with that; right?

13:45:36 5              MR. WIENER:  I think I want to make sure I

13:45:38 6    understand the question a bit more.  If Dr. Prowse testified

13:45:43 7    what --

13:45:45 8              THE COURT:  Dr. Prowse, it sounded like what you

13:45:47 9    said in your case-in-chief, Dr. Prowse would say these

13:45:55 10   agreements are comparable, and I am not a technical person

13:46:00 11   but I understand Dr. Choset is a technical person and I

13:46:04 12   relied on him for the technology aspect of that.  Is that

13:46:08 13   what you were planning to do with Dr. Prowse?

13:46:10 14             MR. WIENER:  To the extent we're entitled to

13:46:13 15   provide the additional basis and evidence to respond to

13:46:17 16   rebuttal reports that were provided in reply, that would be

13:46:21 17   in the initial testimony in our case-in-chief.  If we're

13:46:26 18   limited to only the evidence cited in the initial report in

13:46:29 19   the case-in-chief, then I think Dr. Prowse would get on the

13:46:32 20   stand and explain that he spoke to Dr. Choset to get an

13:46:36 21   understanding of the technology that was covered by the

13:46:38 22   patents-in-suit and that he did significant investigation on

13:46:41 23   his own into the Schoelly licensed patents and the Schoelly

13:46:45 24   product, he came to a determination that they were

13:46:48 25   technologically comparable.

13:46:50 1          It would then go to Auris's expert that their

13:46:54 2   rebuttal case to provide their technological opinion about

13:46:57 3   whether or not they're comparable, and Dr. Alterovitz opines

13:47:01 4   they are not comparable and in reply it would be Dr. Choset

13:47:04 5   and Dr. Prowse providing the opinions that were disclosed in

13:47:08 6   both Dr. Choset's and Dr. Prowse's reply reports.

13:47:13 7          THE COURT:  Okay.  So Mr. Bondor, why isn't what

13:47:17 8   Mr. Wiener just proposed acceptable given thousand of things

13:47:25 9   were disclosed and the response from the technical expert

13:47:28 10   came in response to your technical expert explaining why

13:47:35 11   they were -- I don't know if it's a he or she, didn't think

13:47:38 12   they were comparable?

13:47:39 13          MR. BONDOR:  They're all he's in this particular

13:47:44 14   instance, Your Honor.

13:47:45 15          The reason that that isn't appropriate is

13:47:47 16   because it is not in compliance with Your Honor's scheduling

13:47:51 17   order and essentially the way that Intuitive chose to

13:47:56 18   conduct itself, essentially they laid in wait, just had a

13:48:02 19   conclusionary opinion by someone with no basis to say so,

13:48:07 20   and then only after our expert who does not have the burden

13:48:11 21   comes forth and essentially shows that they are not

13:48:12 22   technically comparable and why he believes so and our

13:48:22 23   experts in compliance with Your Honor's scheduling order

13:48:26 24   laying our case, the problem is that, you know, giving them

13:48:31 25   an extra bite at the apple to try to now rely on Dr. Choset

13:48:36  1    to buttress Dr. Prowse's unjustified conclusion really gives

13:48:41  2    them the opportunity to survey the landscape and puts our

13:48:45  3    experts in the position of having essentially to prebut or

13:48:50  4    guess what Dr. Choset might say when clearly the issue was

13:48:55  5    in Intuitive's hands at the time of the opening report, that

13:48:59  6    Dr. Prowse talked to Dr. Choset about other issues, that

13:49:03  7    they affirmatively chose not to put Dr. Choset up on the

13:49:08  8    stand to talk about this comparability by having Dr. Prowse

13:49:13  9    go on alone on the basis of his untrained determination

13:49:20 10    about the Schoelly agreement.

13:49:22 11          And so essentially, it is unfair to us to have

13:49:26 12    Dr. Choset show up in rebuttal and say, oh, well, I didn't

13:49:31 13    say it the first time around, but after I heard what

13:49:35 14    Dr. Alterovitz said I later decided myself and I took a look

13:49:40 15    at all this stuff that we have the burden of proof on and

13:49:43 16    here is my view on it for the first time in reply and then

13:49:47 17    exacerbating that injustice to have Dr. Prowse say yeah, I

13:49:54 18    got it right after all when it wasn't incumbent on Intuitive

13:49:59 19    to come forward with their entire case at the stage of the

13:50:02 20    opening expert reports, it really puts us behind the eight

13:50:02 21    ball and there is really no way to get around that at this

13:50:02 22    stage.

13:50:02 23          Mr. Wiener actually conceded that first

13:50:12 24    Dr. Prowse did not speak to Dr. Choset on this issue.

13:50:12 25    Dr. Prowse talked about the patents-in-suit, but he did not

and told us at his deposition that he had not discussed the

technical comparability of the Schoelly agreements or the

Schoelly products in his conversations with Dr. Choset and

then to have them be able to turn around and rely on a sort

of post hoc proctor hoc argument from Dr. Choset that

enables Dr. Prowse to point to someone else who actually has

the background just turns the scheduling order on its head

in exactly the same way that we saw in the lost profits

context puts us in the position of rebutting things in our

-- according to the scheduling order rebutting things that

were never disclosed, never disclosed in discovery, never

disclosed at the time.  So that's why I say that it isn't

proper.

              Certainly if one were going to do anything,

having Prowse limited to saying I made the determination

myself in allowing cross on that does something, but the

bottom line is I do think that they still get away with

laying in wait for us because if then they're entitled in

rebuttal to turn around and say by the way, our expert did

look at it and he also agrees, that really unfairly takes

the scheme out of -- it does not force them to live with the

decision that they made when Dr. Prowse put in his opening

report.

              If I could -- I'm sorry.

              THE COURT:  Okay.  Hold on one second.  All

13:52:20 1    right.

13:52:20 2               MR. WIENER:  Your Honor, this is Eric Wiener.

13:52:23 3    May I respond to Mr. Bondor's statement?

13:52:26 4               THE COURT:  No, I heard enough.  I said no, I

13:52:29 5    heard enough on that.  Thanks.

13:52:32 6               Okay.  So I am going to grant the motion to

13:52:37 7    strike in part and deny it in part.  I am going to grant it

13:52:41 8    as to the lost profits opinions offered regarding ISOP for

13:52:45 9    the first time in Dr. Prowse's reply report at paragraphs

13:52:50 10   247 through 251.  In Dr. Prowse's opening report he relied

13:52:56 11   on discussions with Ms. Moses, a witness who had not been

13:52:59 12   disclosed to Defendant during discovery and he relied on her

13:53:02 13   to calculate the incremental margin on certain Ion-related

13:53:07 14   sales for part of his lost profit analysis.  Rather than

13:53:10 15   strike the portions of the report, I gave Plaintiff the

13:53:13 16   break and I allowed Defendant to follow-up with Ms. Moses on

13:53:18 17   those discussions and to ask questions regarding issues

13:53:21 18   relating to profit margin.

13:53:24 19              During the deposition Ms. Moses was asked

13:53:27 20   questions about what the documents that had been produced

13:53:29 21   showed including about profit sharing between ISI and ISOP.

13:53:33 22   Ms. Moses professed not to have any understanding of those

13:53:38 23   issues and testified that the documents produced, which are

13:53:41 24   the ones that she had discussed with Dr. Prowse for his

13:53:50 25   opening report, were total combined profit rebuttal.  After

the deposition, however, Ms. Moses apparently spoke to
Dr. Prowse and explained to him in detail how the
distribution agreement between ISI and ISOP worked,
information that Dr. Prowse used to calculate lost profits
for Intuitive, or perhaps to revise those numbers.  He then
adjusted his original lost profits analysis based on the
information that he learned.

In deciding whether to exclude testimony as
untimely, the Court considers the *Pennypack* factors which
are one, the prejudice or surprise in fact of the party
against whom the excluded witness would have testified; two,
the ability of that party to cure the prejudice; three, the
extent to which waiver of the rule against all unlisted
witnesses would disrupt the orderly and efficient trial of
the case; four, bad faith or willfulness in failing to
comply with the District Court's order.

The Court also needs to consider the importance
of excluded information.

Citing the *Pennypack* factors I will strike the
new opinions in paragraphs 247 through 251 and the cited
exhibits in those paragraphs.

I'll start with the importance of the included
evidence.  Despite Intuitive's assertion that the
information in the paragraph is important, Intuitive's
actions suggest otherwise.  Intuitive has the burden of

proof on damages.  I did not include the opinions or the underlying factual assertions in Dr. Prowse's opening report.  He didn't think that the information was important enough to produce in discovery.  They provided the data underlying those opinions to Dr. Prowse before his opening report.  They do not think that the information was important enough to educate Ms. Moses about before her deposition which was already ordered to try to cure any prejudice from the surprise in the opening report.

Additionally, Intuitive says that its original opening reports had a theory of lost profits from ISOP and if that's the case, then it seems like the new calculations are not critical, and this also supports exclusion.

Next, I turn to the prejudice and surprise to Auris.  And I think it's pretty clear here that Auris has been surprised and prejudiced by the assertion of a new lost profit theory in a reply report.  Typically, reply reports are not a do over to offer new theories and new calculations in response to criticism in a responsive report.  Here I ordered the deposition to be taken to understand what information Dr. Prowse was getting from Ms. Moses in connection with his opinions in his opening report.  At the deposition, Ms. Moses was asked about the profits of ISI and ISOP and testified that she did not have an understanding of how those things worked.  Auris tried to get information and

couldn't, then after the deposition, Ms. Moses obtained new information from unknown sources and had more discussions with Dr. Prowse.  And Dr. Prowse used those discussions as the basis of his revised lost profits theory in his reply report.  Auris had no opportunity to discover information about the purported profit sharing and discount rates in the damages report and had no opportunity to respond to the new theory.

Next, the ability to cure the prejudice and the effect of allowing the new opinions on the orderly and efficient trial, I agree with Auris that there is no cure for the prejudice at this point.  I already gave Intuitive a second chance on its damages case and the result of that was apparently to allow Intuitive to come up with a whole new lost profits theory.  Expert discovery should not be a moving target, but allowing attempts to cure earlier prejudice have made lost profits damages in this case into a moving target.  And although the trial date has been moved, the parties agree that the change would not impact the dispositive motions now.  Dispositive motions are fully briefed.  I think we have something like seven motions and hundreds if not thousands of pages supporting and opposing them.  Allowing additional documents to be produced, additional depositions to be taken, additional expert reports, it's likely to cause changes to or additional

13:58:24 1    motions and interfere with my ability to address the motions

13:58:28 2    prior to trial.

13:58:29 3              And finally, I credit plaintiff's attorney's

13:58:32 4    representations as to how things unfolded here and I will

13:58:35 5    not find that there has been bad faith or willfulness, but I

13:58:39 6    am troubled that after I specifically ordered a deposition

13:58:42 7    on the issue of backdoor communications with Dr. Prowse,

13:58:45 8    plaintiffs waited until after the deposition in which she

13:58:48 9    could not answer questions posed to educate Ms. Moses on the

13:58:52 10   issues discussed with Dr. Prowse to form the basis of his

13:58:55 11   new lost profits.  The result of that again was to have

13:58:59 12   Dr. Prowse rely on undisclosed information.

13:59:02 13             So I am going to grant the motion with respect

13:59:08 14   to paragraphs 247 through 251.

13:59:11 15             Now, as to the second request on the comparable

13:59:13 16   licenses, I am going to deny the motion.  In his opening

13:59:17 17   expert report, Dr. Prowse concluded that the Schoelly

13:59:20 18   agreements were comparable to the hypothetical license in

13:59:23 19   this case.  Auris's expert, Dr. Alterovitz disagreed.

13:59:28 20   Intuitive's technical expert, Dr. Choset, responded to

13:59:34 21   Dr. Alterovitz in his reply report and Dr. Prowse relied on

13:59:38 22   Dr. Choset in his reply report.  Although, it likely would

13:59:42 23   have been better to have a technical expert address the

13:59:44 24   issues up front, I think that given the circumstances here

13:59:47 25   and what was in Dr. Prowse's opening report that all of the

13:59:53 1    opinions Auris seeks to strike were offered to directly

13:59:57 2    contradict or rebut the opposing party's expert, and thus

14:00:01 3    under the circumstances here, I will allow the opinions.

14:00:04 4    And that is both the opinions of Dr. Prowse and Dr. Choset

14:00:08 5    on whom Dr. Prowse relies.

14:00:13 6              That being said, we can allow -- we can address

14:00:16 7    what Intuitive can elicit in its case in chief and what

14:00:22 8    leeway I will give Auris's technical expert to respond to

14:00:26 9    Dr. Choset at trial, even if the opinions that Auris's

14:00:32 10   expert were not in the report because they couldn't have

14:00:36 11   been because they would come in response to what Dr. Choset

14:00:41 12   said later.  We can address all of that in connection with

14:00:44 13   the pretrial proceedings.

14:00:47 14             So that's my ruling, granting in part and

14:00:50 15   denying in part the motion to strike.

14:00:52 16             Is there anything else that we need to address

14:00:54 17   at this point?  From Plaintiff?  From Plaintiff, anything?

14:01:09 18   Is anybody there?

14:01:11 19             MR. BONDOR:  Yes, Your Honor, I'm still here.

14:01:20 20             MS. KELLER:  No questions, Your Honor.

14:01:21 21             THE COURT:  Anything from Defendant?

14:01:22 22             MR. BONDOR:  Nothing further from Defendant,

14:01:24 23   Your Honor.  Thank you, very much.

14:01:25 24             THE COURT:  Thank you everyone.  Have a good

14:01:27 25   weekend.

1       (Teleconference concluded at 2:01 p.m.)

2           I hereby certify the foregoing is a true and
   accurate transcript from my stenographic notes in the proceeding.

3

4                          /s/ Dale C. Hawkins
                          Official Court Reporter
5                          U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25