IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTUITIVE SURGICAL, INC. and INTUITIVE SURGICAL OPERATIONS, INC., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| AURIS HEALTH, INC., | ) ) ) |
| Defendant. | ) |

C.A. No. 18-1359-MN

**MEMORANDUM OPINION**

Karen E. Keller, David M. Fry, SHAW KELLER LLP, Wilmington, DE; Daralyn J. Durie, Vera Ranieri, Eneda Hoxha, Eric C. Wiener, DURIE DANGRI LLP, San Francisco, CA; Frank A. DeCosta, III, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, DC; Jacob A. Schroeder, Arpita Bhattacharyya, FINNEGAN, HENDERSON, FARABOW, GARRET & DUNNER, LLP, Palo Alto, CA – Attorneys for Plaintiffs

Kelly E. Farnan, Renée Mosley Delcollo, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; John M. Desmarais, Paul A. Bondor, Tamir Packin, Cosmin Maier, Brian D. Matty, Jamie L. Kringstein, Joze Welsh, Frederick J. Ding, Ryan G. Thorne, Deborah Mariottini, DESMARAIS LLP, New York, NY – Attorneys for Defendant

August 18, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiffs Intuitive Surgical, Inc. ("ISI") and Intuitive Surgical Operations, Inc. ("IS Ops") (collectively, "Intuitive") sued Defendant Auris Health, Inc. ("Auris") for infringement of several United States Patents. (D.I. 1). Before the Court are Auris's Motion to Exclude Dr. Stephen Prowse's Damages Opinions (D.I. 292); and Auris's Motion for Summary Judgment of No Lost Profits (D.I. 308).

## I.  BACKGROUND

In its prior opinion (D.I. 428), the Court addressed several pre-trial motions that had been filed. The Background section in that opinion is incorporated here by reference to the extent relevant. The pending motions raise issues related to damages.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).

If the moving party carries its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks, citation, and emphasis omitted). The nonmoving party must support an assertion that a material fact is genuinely disputed by: "(A) citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When deciding whether a genuine issue of material fact exists, the court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The mere existence of some alleged factual dispute between the parties," however, "will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis omitted). "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

**B.      Motion to Exclude Expert Opinions and Testimony**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). First, to be qualified, a witness must possess specialized expertise. *Id.* The Third Circuit

has construed this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Second, to be reliable, the opinion must be "ground[ed] in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Third, the expert's opinion "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404.

The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of evidence. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 92 (D. Del. 2016); *Daubert*, 509 U.S. at 592 n.10. "Where there is a logical basis for an expert's opinion testimony," the court should deny a *Daubert* motion and instead allow the jury to determine the credibility and weight of the testimony based on "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 387–88 (D. Del. 2014) (quoting *Daubert*, 509 U.S. at 596).

### III. DISCUSSION

#### A. Lost Profits Damages

Auris seeks summary judgment that Intuitive has not proven entitlement to lost profits as a matter of law. To recover lost profits damages for patent infringement, the patent owner must show a reasonable probability that it would have received the additional profits but for the infringement. *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). "[A] patentee may not claim, as its own damages, the lost profits of a related company." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375 (Fed. Cir. 2015), *vacated on other grounds*, *Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 577 U.S. 1099 (2016).

The facts pertaining to this motion for summary judgment are not in dispute. IS Ops is the owner of the patents-in-suit and is a wholly-owned subsidiary of ISI. (D.I. 311 ¶¶ 35–36). IS Ops manufactures Intuitive's Ion product line and sells the products to ISI. (*Id.* ¶ 37). ISI is a non-exclusive distributor of the Ion product line and sells to customers.[1] (*Id.* ¶ 39). Intuitive intends to seek the lost profits of IS Ops at trial,[2] and provides the expert opinion of Dr. Prowse to support its theory of lost profits.

Auris argues that Intuitive cannot recover lost profits as a matter of law because a patentee can only recover profits on its own sales. (D.I. 309 at 2–4). The Federal Circuit, however, has not foreclosed the possibility that the "inexorable flow" of profits from subsidiary to parent can support a lost profits theory for the two entities collectively. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008), *amended on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009). But here, Auris argues, Intuitive gives no explanation for how the profits of patent ISI flow to subsidiary IS Ops and there is no evidence of "inexorable flow."[3] The Court agrees.

In his amended report, Dr. Prowse stated his understanding that IS Ops owns the patents-in-suit and sells the patented technology to ISI, which then sells the surgical systems to customers, and "[t]he money then goes back to [IS Ops]." (D.I. 389-1, Ex. 6 ¶ 71 (internal quotation marks omitted)). He concluded that "[t]hus, the lost profits calculated below inexorably flow to [IS Ops]." (*Id.*). And thereafter, he referred to the lost profits as experienced by "Intuitive"

---

[1] According to Dr. Prowse, the Ion is Intuitive's robot-assisted bronchoscopy platform, and therefore is in direct competition with Auris's Monarch platform. (D.I. 296-1, Ex. 1 ¶ 109).

[2] Intuitive will not seek the combined lost profits of ISI and IS Ops. (D.I. 335 at 5 n.1).

[3] Auris also argues that the Federal Circuit has not approved a lost profits theory based on the reverse: profits inexorably flowing from parent to subsidiary.

collectively. These conclusory statements, however, are insufficient to support a collective assertion of lost profits incurred by ISI and IS Ops.[4]

The Court agrees that Intuitive cannot show entitlement to lost profits. Intuitive argues that trial courts accept a variety of methods to show lost profit damages.[5] Intuitive, however, has not shown how, under any theory or method, IS Ops would have made additional sales but for Auris's alleged infringement. Intuitive has only provided a theory of ISI's lost profits and a conclusory statement that the profits of ISI inexorably flow to its subsidiary IS Ops. Although this distinction may appear overly formalistic, the Federal Circuit has explained that two companies

---

[4] Dr. Prowse's reply report distinguishes the lost profits of ISI and IS Ops based on information not disclosed to Auris during discovery. (D.I. 342-1, Ex. 38 ¶¶ 247–51). While its motion for summary judgment was pending, Auris moved to strike the portion of Dr. Prowse's reply report that relied on this undisclosed information. (D.I. 388). The Court granted the motion. (D.I. 416 at 35:7–10). The parties agree that striking this portion of Dr. Prowse's reply report would cause Dr. Prowse to rely on the lost profits theory set forth in his amended opening report. (*See* D.I. 416 at 11:22–24 (Auris: "If you grant our motion to strike, then [Intuitive] will be left with their lost profits theory as set forth in the opening report."); *id.* 24:21–25 (Intuitive: "[I]f this motion to strike were granted, [Dr. Prowse] would be limited to providing his 100 percent allocation that he provided in his opening report.")). Thus, the Court does not consider the parties' arguments about Intuitive's "true-up" theory and "discount" theory contained in the stricken portions of Dr. Prowse's reply report. (*See* D.I. 309 at 4–5; D.I. 335 at 6–7; D.I. 384 at 2–3).

[5] Intuitive cites as an example *In re Biogen '755 Patent Litigation*, in which the district court allowed the patentee to present evidence of lost profits although the patentee did not sell the patented product to the U.S. market. C.A. No. 10-2734 (CCC) (JBC), 2018 WL 3586271, at *19–20 (D.N.J. July 26, 2018). In that case, the patentee sold the patented product to a related company, which in turn sold to consumers. *Id.* at *19. The patentee was awarded lost profits based on its own lost sales to the related company. This approach is consistent with Federal Circuit law. *See Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) ("It is true that the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device. However, the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales."). By contrast, Intuitive has only provided a lost profit analysis based on Intuitive's lost sales to consumers, not IS Ops' lost sales to ISI. (*See* D.I. 342-5, Ex. 42 ¶ 108 (explaining that Dr. Prowse calculated Intuitive's lost profits based on information about Auris's sales of the Monarch system, consumables, training, and extended service to consumers)).

that benefit from dividing patent ownership from sale of the patented product must also accept the consequence that the patent owner will be unable to claim the lost profits experienced by the seller. *See Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004).

Auris contends that Dr. Prowse's methodology fails to distinguish between the lost profits of the two plaintiffs, ISI and IS Ops. Therefore, Auris's motion for summary judgment of no lost profits (D.I. 308) is **GRANTED**.

B. **Auris's Motion to Exclude Dr. Prowse's Damages Opinion**

Auris seeks to exclude the opinion of Intuitive's damages expert Dr. Stephen Prowse related to lost profits damages and reasonable royalty damages. (D.I. 292). The Court has already decided to grant summary judgment on the lost profits issue and thus will only address the issues relating to the reasonable royalty.

a. Reasonable Royalty Damages

1) Economic Comparability of Licenses

Auris argues that Dr. Prowse's opinion on reasonable royalty damages should be excluded because Dr. Prowse fails to reconcile the different license structures between his proposed hypothetical license and the comparable licenses on which he relies. (D.I. 294 at 5–6). To determine a reasonable royalty on a hypothetical license, parties frequently consider comparable license agreements. *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372 (Fed. Cir. 2020). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Id.* at 1372–73 (citing generally *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51 (Fed. Cir. 2012)). The Federal Circuit has held that running-royalty license agreements can be relevant to determining the reasonable royalty for a lump-sum damage award if the jury is given some basis "to recalculate in a meaningful way the

value of any of the running royalty agreements to arrive at the lump-sum damages award." *Lucent Techs.*, 580 F.3d at 1330. If, however, the expert provides no such basis for comparing the running-royalty license to a lump-sum hypothetical license, the expert opinion is properly excluded. *See Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-cv-1122-RGA, 2019 WL 330149, at *6 (D. Del. Jan. 25, 2019).

In his reasonable royalty damages opinion, Dr. Prowse structured the proposed hypothetical license between Auris and Intuitive as a lump sum license. (D.I. 296-1, Ex. 1 ¶ 139). Dr. Prowse considers two licenses between Intuitive and Schoelly Fiberoptic GmbH ("the 2011 Schoelly Agreement" and "the 2019 Schoelly Agreement") to be comparable for purposes of the hypothetical lump sum license. (*Id.* ¶¶ 262–63, 268–69). The two Schoelly Agreements are structured as running royalty licenses. Auris contends that Dr. Prowse erred by failing to reconcile the "fundamental differences [that] exist between lump-sum agreements and running-royalty agreements." (D.I. 294 at 5, quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009)). The Court disagrees.

Dr. Prowse explained why the parties would have preferred a lump sum agreement. (D.I. 296-1, Ex. 1 ¶¶ 139–44). Then, he compared the different facts and circumstances between the Schoelly Agreements and the hypothetical Auris agreement and concluded that the running royalty rate of the Schoelly Agreements is understated. (*Id.* ¶ 272–77). Adjusting for these differences, Dr. Prowse inflated the 5% running royalty rate of the Schoelly Agreements to a 7% royalty rate in the hypothetical lump-sum agreement. (*Id.* ¶ 289). The jury can evaluate

Dr. Prowse's conversion of a 5% running royalty rate in the Schoelly Agreements to a 7% royalty rate in the hypothetical lump-sum agreement.[6]

### 2) Technological Comparability of Licenses

Auris also argues that Dr. Prowse failed to demonstrate that the agreements on which he relies were technically comparable. (D.I. 294 at 6–8). For both Schoelly Agreements, Dr. Prowse opined that it is "apparent from the face of" the licensed patents that they "claim systems and/or methods for endoscopy." (D.I. 296-1, Ex. 1 ¶¶ 261, 265). Dr. Prowse concluded that the licensed patents are technologically comparable to the patents-in-suit. Auris argues that this opinion is based on unsound methodology and is nothing more than "hazy reasoning that [the licensed patents and the patents-in-suit] all relate to product features rather than core technology." (D.I. 294 at 7 (quoting *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 667 (D. Del. 2016))).

The Court disagrees. In *Bio-Rad Laboratories*, the Federal Circuit found that the district court had not abused discretion in admitting an expert opinion showing a "baseline comparability" with licenses covering "patents related to microfluids" and "deal[ing] with . . . instruments that are used in biochemical reactions," when the patents-in-suit were "directed to systems and methods for forming microscopic droplets . . . to perform biochemical reactions." 967 F.3d at 1374. Here, Dr. Prowse stated that the patents licensed in the Schoelly Agreements and the patents-in-suit are technologically comparable because all claim "systems and/or methods for endoscopy."

---

[6]  Intuitive argues that Dr. Prowse applied a 9.5% discount to account for the difference in value between a one-time payment and a running-royalty stream. (D.I. 339 at 5). The report, however, states that this discount was applied to the royalty base to account for the time value of money. (D.I. 296-1, Ex. 1 ¶ 290 ("I summarized the revenues from March 2018 through the expiration date of each of the patents-in-suit. Next, I have discounted these revenues back to the hypothetical negotiation date for each of the patents-in-suit.")). The discount did not account for the differences between a running-royalty agreement and a lump-sum agreement.

Dr. Prowse also asserted that his discussions with Intuitive's technical experts informed Dr. Prowse's conclusion on comparability. (D.I. 342-5, Ex. 42 ¶¶ 42–59, 216–43). In his reply report, Dr. Prowse stated that he relied on the opinion of Intuitive's infringement expert, Dr. Choset, to conclude that the licensed patents and the asserted patents were technologically comparable.[7] (D.I. 389-1, Ex. 1 ¶ 135). Dr. Prowse thus established a "baseline comparability" between the Schoelly licensed patents and the patents-in-suit that warrants admitting this opinion. *Bio-Rad Labs.*, 967 F.3d at 1374; *id.* at 1373 ("[T]he issue of comparability is often one of sufficiency of evidence, not admissibility." (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014))).

Auris's cited Federal Circuit authorities do not hold otherwise. In *ResQNet.com*, the Federal Circuit vacated a jury award of running-royalty damages because it was derived from lump-sum licenses with no connection to a running royalty and "re-bundling" licenses that provided software and services with no relation to the claimed technology. 594 F.3d at 873. *ResQNet.com* concerned the sufficiency of evidence to support a jury award, not the admissibility of such evidence. Similarly, in *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, the Federal Circuit vacated a jury's lump-sum damages award "[b]ecause the verdict was clearly not supported by the evidence and based only on speculation or guesswork." 609 F.3d 1308, 1322 (Fed. Cir. 2010) (internal quotation marks omitted). Its decision was not about the admissibility of expert testimony on damages. Auris argues that Dr. Prowse did not provide sufficient evidence of technological comparability. At this stage, the Court is not persuaded that the technologies covered by the Schoelly Agreements and the hypothetical license are so unrelated as to "simply

---

[7] While this *Daubert* motion was pending, Auris moved to strike the portion of Dr. Prowse's reply report that relied on Dr. Choset's technological comparability opinion. (D.I. 388). The Court denied the motion. (D.I. 416 at 39:15–16).

9

have no place in this case." *ResQNet.com*, 594 F.3d at 871.  Thus, the opinion is not excluded on this basis.

### 3) Apportionment and Calculation of Royalty Rate

Finally, Auris argues that Dr. Prowse's reasonable royalty rate is flawed because it is not apportioned relative to the value of the patents-in-suit or otherwise tied to the facts of the case. (D.I. 294 at 8–10).  Patent infringement damages must be apportioned to reflect the value attributable to the infringing features of a multi-component product.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  Auris argues that Dr. Prowse's assumptions underlying his apportionment analysis are unfounded and inconsistent, and based on these assumptions, Dr. Prowse neglected to assess the proportion of the Schoelly endoscope attributable to the licensed patents, compared to the proportion of the Monarch system related to the patents-in-suit.

The Court disagrees.  The Federal Circuit has voiced approval of an expert's damages opinion where "apportionment is essentially embedded in" or "built in[to]" an agreement relied on as comparable.  *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019); *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015).  In his amended opening report, Dr. Prowse opined that his lost profits analysis, following the four-factor *Panduit* test, "results in separation of profits attributable to the patented inventions." (D.I. 389-1, Ex. 5 ¶ 72, citing *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978)).  Dr. Prowse stated that his "lost profits analysis necessarily separates the value attributable to the patented inventions" because he only considered sales where there was no commercially acceptable non-infringing alternative.  (*Id.*).  Thus, Dr. Prowse's opinion accounts for apportionment.  Auris's outstanding challenges to Dr. Prowse's

10

apportionment analysis, such as to his "unfounded and inconsistent" assumptions, go to the weight and credibility of his opinion and therefore do not counsel exclusion.

Auris also contends that Dr. Prowse did not adequately explain his conclusion that "certain factors would cause the parties to move up from the rates found in the Schoelly Agreements" to arrive at a 7% royalty rate. (D.I. 294 at 10). Auris argues that Dr. Prowse's reasonable royalty analysis "did *exactly* what the Federal Circuit rejected in *Exmark*." (*Id.* at 8). In *Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*, plaintiff's damages expert "identified a number of advantages" provided by the patent-in-suit and applied them to *Georgia-Pacific* factors nine (utility and advantage of the patented technology) and ten (the nature of the patented invention). 879 F.3d 1332, 1349 (Fed. Cir. 2018). Without comprehensively analyzing the remaining *Georgia-Pacific* factors, the expert arrived at a 5% royalty rate, up from the 3.64% royalty rate in a comparable settlement agreement. *Id.* at 1349–50. The Federal Circuit vacated the damage award below and clarified that, "[w]hile mathematical precision is not required, some explanation of both why and generally to what extent the particular factors impact the royalty calculation is needed." *Id.* at 1350–51 (citing *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) (internal marks omitted)).

The Court disagrees that Dr. Prowse's reasonable royalty analysis suffers the same deficiency as the expert opinion excluded in *Exmark*. Dr. Prowse derived a 5% running royalty rate from the 2011 Schoelly Agreement and a 9% effective running royalty rate from the 2019 Schoelly Agreement. (D.I. 296-1, Ex. 1 ¶¶ 263, 268). He then considered "multiple factors" in his *Georgia-Pacific* analysis to conclude that the parties to a hypothetical negotiation would move up from the rates in the Schoelly Agreements. (*Id.* ¶ 289). "These factors include the intense and direct competition between the parties and Intuitive's history and desire not to license to

11

competitors (*Factors 4 and 5*), the significant future value that Auris would have received related to future products as well as the potential additional harm to Intuitive (*Factor 6*), the current and expected commercial success of the Accused Products (*Factors 8 and 11*), and the fundamental nature of the patents-in-suit as well as the multiple benefits provided by the patents-in-suit to the Accused Product and its functionality and success in the market (*Factors 9 and 10*)." (*Id.* ¶ 289 (emphasis in original)). By considering the parties' bargaining positions, the nature of the patents-in-suit, and the allegedly infringing products, Dr. Prowse tied the reasonable royalty analysis to the facts of this case and distinguished the circumstances of the Schoelly Agreements. Dr. Prowse provided enough factual support for a jury to assess Auris's challenge to the weight and credibility of his opinion. Thus, Dr. Prowse's apportionment and reasonable royalty rate calculation are not grounds for exclusion.

### IV.     CONCLUSION

For the foregoing reasons, Auris's motion for summary judgment of no lost profits (D.I. 308) is GRANTED. Auris's motion to exclude Dr. Prowse's damages opinion (D.I. 292) is DENIED. An appropriate order follows.