13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTUITIVE SURGICAL, INC.,   )
and INTUITIVE SURGICAL      )
OPERATIONS, INC.,           )
                            )
          Plaintiffs,       )
                            ) C.A. No. 18-1359(MN)
v.                          )
                            )
AURIS HEALTH, INC.,         )
                            )
          Defendant.        )

Monday, June 5, 2023
10:00 a.m.
Oral Argument

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

          SHAW KELLER LLP
          BY:  KAREN KELLER, ESQ.

          -and-

          FINNEGAN HENDERSON
          BY:  FRANK A. DeCOSTA, III, ESQ.
          BY:  DANIEL TUCKER, ESQ.
          BY:  JACOB SCHROEDER, ESQ.
          BY:  DAVID FAURIE, ESQ.

                    Counsel for the Plaintiffs

1     APPEARANCES CONTINUED:

2

3              RICHARDS LAYTON & FINGER
               BY:  KELLY E. FARNAN, ESQ.

4              -and-

5              DESMARAIS LLP
               BY:  COSMIN MAIER, ESQ.

6              BY:  TAMIR PACKIN, ESQ.
               BY:  JAMIE L. KRINGSTEIN, ESQ.

7                      Counsel for the Defendant

8

9

10                      _ _ _ _ _ _ _ _ _ _ _

11

09:50:28  12

09:50:28  13            THE COURT:  Good morning, everyone.  Please be

10:03:50  14   seated.  All right.  Why don't we start with a few

10:03:58  15   introductions.

10:03:59  16            Ms. Keller.

10:03:59  17            MS. KELLER:  Good morning, Your Honor.  Karen

10:04:02  18   Keller from Shaw Keller on behalf of the plaintiff.  With me

10:04:05  19   today is Frank DeCosta.

10:04:08  20            MR. DeCOSTA:  Good morning, Your Honor.

10:04:09  21            MS. KELLER:  Daniel Tucker.

10:04:11  22            MR. TUCKER:  Good morning, Your Honor.

10:04:12  23            MS. KELLER:  Jacob Schroeder and David Faurie,

10:04:14  24   all from Finnegan Henderson.

10:04:18  25            THE COURT:  All right.  Good morning.

10:04:21 1    Ms. Farnan.

10:04:22 2    MS. FARNAN:  Good morning, Your Honor.  Kelly

10:04:25 3 Farnan from Richards, Layton & Finger on behalf of Auris.

10:04:28 4 I'm joined by my co-counsel Desmarais, LLP, Cosmin Maier,

10:04:35 5 Tamir Packin, Jamie Kringstein, and we also have with us

10:04:39 6 Julie Lanore who is not yet admitted, first year at

10:04:43 7 Desmarais.

10:04:43 8    THE COURT:  Good morning to all of you and

10:04:44 9 welcome.  All right.  So we have the motion to stay and I

10:04:52 10 have read the papers and I get it that it makes a big

10:04:59 11 difference with respect to ultimate liability and damages,

10:05:04 12 but it seems like we're going to have to have a trial

10:05:10 13 anyway, so I'm trying to figure out why it makes sense to

10:05:14 14 stay everything -- hold on a second until I get my question

10:05:19 15 out -- why it makes sense to stay everything when we

10:05:22 16 certainly could address this by just, you know, asking what

10:05:26 17 a royalty rate was so that we can figure out what damages

10:05:30 18 get thrown out if the jury were to find infringement for a

10:05:36 19 patent that is ultimately not found to be valid.  So it

10:05:40 20 doesn't -- all it seems like doing is we are kicking this

10:05:44 21 can down the road.  We've already kicked it multiple time,

10:05:48 22 and I I'm just not understanding why this makes sense.  So

10:05:52 23 now, come on up.

10:05:57 24    MR. MAIER:  Good morning, Your Honor.  Cosmin

10:05:59 25 Maier for Auris.

10:06:01 1    So I think the problem with trying to figure out
10:06:03 2 a way to present damages that would allow us to extract
10:06:08 3 those related to the '276 patent if it's found invalid at
10:06:13 4 the Patent Office is that there is no damages presentation
10:06:17 5 that Intuitive included in its expert report that would
10:06:21 6 allow that.  It's essentially asking for a different damages
10:06:25 7 figure based on the last to expire patent.  But what if we
10:06:31 8 end up with -- and I'll give an example, Intuitive is going
10:06:34 9 to ask for 150 million if the '276 is the last patent to
10:06:38 10 expire that's valid and infringed.  It will ask for $4
10:06:42 11 million if it's the '056 patent, the next last to expire
10:06:46 12 patent.  But what do we do if the jury comes back with a
10:06:49 13 verdict of $10 million, and then the '276 is invalid?
10:06:54 14    THE COURT:  But I was saying, why can't we deal
10:06:57 15 with it?  I mean, are they just asking for a number or are
10:07:01 16 they asking for a royalty rate?
10:07:03 17    MR. MAIER:  They're asking for a number.  They
10:07:04 18 don't have royalties per patent.
10:07:06 19    THE COURT:  Why can't we just ask for what would
10:07:09 20 it be if it was just this patent alone, what would it be if
10:07:11 21 it was just these two patents?
10:07:14 22    MR. MAIER:  We would have to redo damages in
10:07:16 23 that instance, so we would have to -- well, we did it by
10:07:20 24 patent, a specific percentage per patent.  Intuitive didn't
10:07:22 25 do it that way so I guess they would have to present the new

10:07:27 1    damages theory at this point allocating a royalty rate per

10:07:32 2    patent, and then I guess we would have to depose the expert

10:07:36 3    again and go through all of that which would ultimately push

10:07:40 4    --

10:07:40 5         THE COURT:  Why wouldn't you have to do all that

10:07:44 6    if the patent were found to be -- let's say you win in the

10:07:48 7    *ex parte* re-exam, okay, what happens, do you have to go and

10:07:53 8    redo all that discovery anyway?

10:07:55 9         MR. MAIER:  No, because if the '276 patent is

10:07:57 10   out, then we would have a damages model on the Auris side

10:08:03 11   that just allocates damages per patent and a damages model

10:08:08 12   on the Intuitive side that ends up at a cap fee of about $4

10:08:12 13   million.  So we don't need to redo that.  If the '276 patent

10:08:15 14   is out, all of those projections that go out to 2032 go away

10:08:20 15   and we actually have damages figures from up until patent

10:08:24 16   expiration.  So we wouldn't need to redo damages in that

10:08:28 17   scenario.

10:08:31 18        THE COURT:  Okay.  That's one thing.  Why don't

10:08:34 19   you go through the other references, other areas.

10:08:37 20        MR. MAIER:  Sure.

10:08:38 21        So, Your Honor, the reason we brought this

10:08:41 22   motion is because the Patent Office rejected the '276

10:08:45 23   claims.  Intuitive responded on May 2nd.  So now we're at

10:08:48 24   the point where all we're waiting for is a final office

10:08:51 25   action from the Patent Office on the merits.

10:08:53 1          THE COURT:  Yeah, but what's the timing of

10:08:55 2    these?  I remember *ex parte* -- remind me, is this an *ex*

10:09:02 3    *parte*?

10:09:02 4          MR. MAIER:  It is, Your Honor.

10:09:03 5          THE COURT:  I remember that from when I was a

10:09:05 6    young lawyer and they would just go on for like eight years.

10:09:08 7    So it struck me as sort of odd that you were like, oh, we're

10:09:12 8    going to know by April of next year.

10:09:13 9          MR. MAIER:  Well, we looked at the statistics

10:09:16 10   and they finish in a median of eighteen months which would

10:09:19 11   put us at April 2024.  We think that this one will turn out

10:09:24 12   faster because we already have a nonfinal rejection and we

10:09:27 13   have a response from Intuitive, so there is one more thing

10:09:30 14   that needs to happen and that's just the final office

10:09:33 15   action.  There has already been an examiner interview with

10:09:36 16   Intuitive, so we're just waiting on one more paper.  It

10:09:39 17   could come next month.  In median time it could come by

10:09:43 18   April.  But that's the timeline we're looking for.

10:09:46 19          And the reason we think that Intuitive can

10:09:49 20   hardly claim prejudice here is because back in September of

10:09:52 21   2021, after the close of fact discovery, after summary

10:09:56 22   judgment, Intuitive came to the Court and asked to delay

10:09:59 23   trial while it appealed an invalidity finding concerning a

10:10:02 24   different patent, the '601 patent.

10:10:05 25          THE COURT:  Yeah, but we should have had trial

10:10:07 1    already like a whole bunch of times and I think it was

10:10:09 2    largely your client who made us push it back to where we are

10:10:13 3    now.  So I mean, if not for me saying okay, you know, you

10:10:18 4    have whatever going on in your personal lives, we'll push it

10:10:22 5    off, we would have already had trial before you would have

10:10:26 6    made this motion.  So they have been sort of patient with

10:10:29 7    you guys saying we're going to push it off, we're going to

10:10:33 8    push it off, I get it once they allowed it to be stayed, but

10:10:37 9    why isn't it now becoming prejudicial?

10:10:40 10             MR. MAIER:  Well, for two reasons.  One, both

10:10:44 11   sides asked for postponements for various scheduling reasons

10:10:48 12   with witnesses and that sort of thing.  But the big delay

10:10:52 13   was when Intuitive -- Your Honor gave Intuitive a choice, do

10:10:56 14   you want to keep the '601 patent in and proceed to trial, or

10:11:00 15   do you want to drop that, or do you want to keep the '601

10:11:05 16   out and proceed to trial now or do you want to wait until

10:11:08 17   your appeal is done so you can try to revive that patent at

10:11:12 18   the Federal Circuit, and Intuitive chose the later because

10:11:15 19   it saw some benefit in the delay when the delay could have

10:11:18 20   benefited Intuitive by reviving an invalidated patent, it

10:11:22 21   was fine for postponing trial for more than a year on all

10:11:27 22   these other patents as well.  There seemed to be no undue

10:11:30 23   prejudice then when Intuitive thought there was a benefit to

10:11:33 24   the delay.  So that's why there is no undue prejudice.

10:11:36 25             The other reason is because the only thing that

10:11:38  1   is at issue here are monetary damages.  Intuitive is not

10:11:42  2   seeking to exclude Monarch from the market so there is no

10:11:47  3   loss of market share, they're just looking for money.

10:11:49  4          THE COURT:  Let me ask you this.  What do I

10:11:51  5   do -- you say the median time which to me doesn't really

10:11:54  6   mean much, but the median time is eighteen months.  So let's

10:11:58  7   say we get to next April and you're like hey, nothing has

10:12:01  8   happened, we don't know what's going to happen, you should

10:12:04  9   just continue this stay indefinitely, is that what you're

10:12:07 10   going to tell me?

10:12:08 11          MR. MAIER:  Well, I think we would revisit --

10:12:10 12          THE COURT:  You would say -- no, no, no, I want

10:12:12 13   to know, because I don't want to get to next April if I

10:12:14 14   agree with you now and have you say oh, you know what,

10:12:19 15   Judge, it's just going to be another six months, they can

10:12:22 16   wait another six months, no harm.  Really, that's what we're

10:12:26 17   going to do?

10:12:27 18          MR. MAIER:  I think that would increase the

10:12:29 19   prejudice.  Six months shouldn't be any prejudice.

10:12:30 20          THE COURT:  Of course it is.  We've already been

10:12:34 21   delayed like a year.  Why isn't every month that goes by

10:12:36 22   prejudicial to them?

10:12:39 23          MR. MAIER:  Because it could be compensated by

10:12:41 24   interest and there is no -- there is nothing else at issue

10:12:45 25   here.  It's just about money.  They're not seeking to

1  exclude us from the market, so waiting another six months to

2  collect money --

3          THE COURT:  We're not talking six months.  I'm

4  asking -- what you are asking me is essentially a stay

5  without an end because the stay to you will only end if and

6  when the Patent Office gives you what you want.  If the

7  Patent Office doesn't, then I guess you're going to go to

8  the Federal Circuit and say hey, Judge, stay it, because all

9  these things still factor in.  And what I'm thinking is

10 we're not looking at a delay until next April, we're looking

11 at a delay for years.

12         MR. MAIER:  There is a slight nuance there.  So

13 we actually, Auris does not have a right to appeal an

14 adverse determination under the EPR, so if the claims are

15 confirmed, that's it for us, we can't request a further stay

16 at that point.

17         THE COURT:  But if this *ex parte* re-examination

18 takes five years, you want me to stay this case for five

19 years?

20         MR. MAIER:  I think Your Honor could revisit it

21 at that point.  What we're saying --

22         THE COURT:  No.  What's the point?  Once I stay

23 it once, then why wouldn't I stay it again?

24         MR. MAIER:  If it looks like it's going to take

25 years --

10:13:54  1              THE COURT:  What's the difference in prejudice

10:13:56  2     going to be?  You're going to be like, yeah, they can still

10:14:00  3     get interest, prejudgment interest and the interest rates

10:14:03  4     are going up, so lucky them.

10:14:05  5              MR. MAIER:  Your Honor, we wouldn't ask you to

10:14:07  6     stay the case for five years.

10:14:08  7              THE COURT:  You wouldn't, just you're asking me

10:14:10  8     to do it twelve months at a time.  So of course you're not

10:14:14  9     sitting here saying stay it for a year, but next April

10:14:18 10     you'll come and say oh, they're going to decide it soon,

10:14:21 11     probably within six months.  You'll get to the end of that

10:14:25 12     six months, they're going to decide it soon, probably within

10:14:28 13     six months.  And you can see how each one, death by a

10:14:31 14     thousand cuts.

10:14:32 15              MR. MAIER:  I see your point, Your Honor.  And

10:14:34 16     look, we could say we won't do that and Your Honor could

10:14:38 17     reject that if we were to try.  Right?  But I think where

10:14:41 18     we're at now is the statistics show that we think that this

10:14:45 19     is going to conclude soon, probably sooner than April just

10:14:48 20     because we already have the rejection and the response now,

10:14:52 21     so all we're waiting is for one more thing, that's why we

10:14:55 22     think it's going to end sooner.

10:14:57 23              And you also have to look at the benefits here.

10:15:00 24     In the factors, there are four reasons that this stay could

10:15:02 25     meaningfully simplify this case.  The first is that

10:15:10 1   Intuitive complains that the EPR does not have the same

10:15:14 2   estoppel effects on prior art as --

10:15:16 3                   THE COURT:  Yeah, I actually meant to ask you

10:15:17 4   about that one.  So you say oh, we're going to essentially

10:15:21 5   agree to an IPR-like estoppel.  Do you have system art?

10:15:26 6                   MR. MAIER:  We have one piece of system art.

10:15:28 7                   THE COURT:  So you're going to still assert

10:15:30 8   system art and is that system art that is somehow discussed

10:15:36 9   or described in some of the paper art that's in front of the

10:15:39 10  Patent Office?

10:15:39 11                  MR. MAIER:  It relies on completely different

10:15:42 12  documents and a deposition.

10:15:43 13                  THE COURT:  But is it the same system, is it a

10:15:45 14  system that is in that paper?

10:15:47 15                  MR. MAIER:  I don't think -- there is one

10:15:49 16  patent.

10:15:49 17                  THE COURT:  Would you agree to give up asserting

10:15:51 18  that system if I were -- as well as the paper art if I were

10:15:56 19  to grant this motion?

10:15:58 20                  MR. MAIER:  I will definitely discuss that with

10:16:00 21  my client.  I think we could be amenable to that.

10:16:03 22                  THE COURT:  You would give up essentially all

10:16:05 23  prior art defenses?

10:16:06 24                  MR. MAIER:  If I could confer with my client,

10:16:08 25  yes, Your Honor, I think we would.

10:16:10 1          THE COURT:  So I'm just going to have that as

10:16:13 2   you would consider and you can talk to your client.  You

10:16:15 3   don't have to do it this second, but you can do it before we

10:16:18 4   leave here.

10:16:20 5          Go ahead.

10:16:21 6          MR. MAIER:  Sure.  The three other ways apart

10:16:23 7   from that stipulation, the so-called Sotare stipulation that

10:16:27 8   this case would be simplified is again I'll point to

10:16:30 9   Intuitive's damages model.  They're trying to base their

10:16:34 10  model off of projections that go up to 2032.  That's going

10:16:39 11  to be the central dispute on damages in this case whether

10:16:41 12  those projections are valid or completely divorce from

10:16:44 13  reality which we'll show.  But without the '276 patent, all

10:16:48 14  the other patents, the other three patents have expired, so

10:16:51 15  we actually have financial data through expiration.  So we

10:16:55 16  could actually talk about real data rather than having

10:16:58 17  fights on projections.

10:16:59 18          The third way is it would eliminate technical

10:17:03 19  testimony.  It would absolutely eliminate at least one

10:17:07 20  expert and likely several fact witnesses who were to testify

10:17:11 21  about the existence of a control system that involves source

10:17:14 22  code, so it would simplify the technical issues in the case.

10:17:18 23          And then finally, any concessions that Intuitive

10:17:21 24  makes in the EPR to distinguish the prior art will also have

10:17:24 25  an effect on this case and what infringement theories it can

10:17:29 1    pursue at trial.

10:17:30 2            I'll address two quick points that I think

10:17:32 3    Intuitive is going to make.  The first point I think on

10:17:36 4    their third slide they're going to say well, the '276 EPR

10:17:40 5    isn't going to get rid of the entire patent because it's

10:17:43 6    likely that some claims may survive and some claims are

10:17:46 7    rejected.  We submit that that's not true in this case.

10:17:49 8    That's because if you look at Auris's slide 3, Intuitive

10:17:53 9    responded to the rejection, the rejection applied to all of

10:17:56 10   the asserted claims.  Intuitive responded only by making

10:18:00 11   arguments concerning claim 1.  They didn't separately argue

10:18:04 12   for the patentability of any of the other claims.  So

10:18:08 13   whether the claims are confirmed or rejected will depend on

10:18:12 14   whether the examiner is persuaded by Intuitive's response

10:18:16 15   concerning claim 1, not a subset of claims like Intuitive

10:18:20 16   will argue.

10:18:21 17           I'll skip slides 4 and 5 which give some

10:18:27 18   concrete examples of how the case would be simplified on the

10:18:30 19   damages and on the technical issues, but I want to briefly

10:18:34 20   address what's on slide 7.  So I mentioned that the EPR

10:18:37 21   could limit the theories that are presented at trial and

10:18:41 22   Intuitive appears to be taking inconsistent positions in the

10:18:44 23   EPR and in the District Court.  In the litigation Intuitive

10:18:46 24   is asserting that Monarch's pause button, the accused

10:18:52 25   product's pause button satisfies this claim control system

that requires to hold or return a catheter because the pause button just disabled user control.

Intuitive didn't show in the litigation in any of its expert reports that Monarch has a control system that actively performs some action to hold the bronchoscope in place.  But in the EPR, Intuitive tried to persuade the examiner in a phone interview that the claims required the control system "to actively perform some action to hold the catheter in place."

Now, of course after the examiner put that in writing and memorialized it, Intuitive is trying to backtrack on that concession now.  But regardless of whether they can reframe that concession now, this is just an example of the types of statements that happen between the patent owner and the Patent Office that can have an affect on trial and that it's worth waiting on.

Now, I also want to address one other point I expect Intuitive to make and it's that the EPR only effects one of the four patents in this case and there are three other patents.  But again, the issue is not case elimination, it's issue simplification under the standard.  And we think that getting rid of the most significant patent in the case will involve considerable simplification.  I think Your Honor addressed this same scenario in *AgroFresh v. Essentiv* where Your Honor granted a stay four-and-a-half

months from trial when one of the three patents-in-suit had been rejected in an IPR.

And actually I know Intuitive itself previously came before a different judge in this district and moved for and received a stay where fewer than all of the asserted patents were undergoing IPR proceedings.

So I'll turn to undue prejudice since Your Honor was asking about that earlier. And there are four issues here. The first I already mentioned. It's black letter law that waiting on money doesn't constitute undue prejudice because there could be an award of interest and there is no injunctive relief sought here nor can there be because they're seeking damages through the expiration of all the patents.

Now Intuitive is also going to say that a stay could last beyond a final rejection by a Patent Office. Even if we get a rejection tomorrow, Intuitive says it has a right to appeal an adverse determination and that could cause the stay to drag on longer. But if you consider that scenario, in that scenario we will have a final rejection on the '276 patent at the Patent Office, so would it have made sense to go through an entire trial on a patent that the examiner rejects days, weeks, or a few months later? We submit that there wouldn't be.

Like I said, Auris can't appeal an adverse

10:21:54 1    determination.  If the claims are confirmed, that's it,

10:21:57 2    Auris is done with the EPR.

10:21:58 3              Intuitive is also going to raise the timing of

10:22:03 4    the request for the stay and the timing of the EPR's, those

10:22:08 5    are subfactors under the undue prejudice factor.  And I just

10:22:12 6    will briefly mention two points on those.  So regarding the

10:22:15 7    timing of the request of the stay, we waited to bring the

10:22:19 8    motion until the Patent Office issued a rejection of all the

10:22:22 9    asserted claims.  We filed the motion to stay fewer than two

10:22:25 10   months after that rejection and five months before trial.

10:22:28 11   If we had filed the motion to stay when the EPR was first

10:22:33 12   granted, when Intuitive says we should have filed it,

10:22:36 13   Intuitive would certainly be up here arguing that a stay was

10:22:40 14   unwarranted because it was premature because we didn't have

10:22:43 15   the Patent Office's view yet, so that's why we filed it once

10:22:49 16   we had the Patent Office's view, once we had a rejection.

10:22:52 17             Concerning the timing of when we filed the EPR,

10:22:54 18   if Your Honor recalls, we filed the EPR shortly after

10:22:58 19   Intuitive asked for more than a year delay so it could try

10:23:02 20   to revive a different patent.  So at that point in time,

10:23:02 21   Intuitive was seeking delay so it could benefit by getting

10:23:02 22   another patent in the case.  This wasn't a scenario where

10:23:12 23   Intuitive was pressing forward with trial and Auris

10:23:17 24   strategically filed an EPR to try to throw a wrench in that

10:23:22 25   plan.  There was already going to be a delay.  Intuitive was

looking at the delay for its own benefit, that's why the
timing can't be prejudicial.

          And frankly like I said, it's Intuitive's burden
to actually articulate the undue prejudice and the only
thing they pointed to, the only thing they can point to is
they won't get their money quickly enough, and again,
interest is enough to compensate.

          They make a point about lost market share, but
they're not seeking to exclude Monarch from the market, they
are just looking for money.

          And, Your Honor, I'll close on the first point I
made, which is after the PTAB invalidated the '601 patent,
Your Honor presented Intuitive with a choice, drop the
patent from the case and go forward with the trial or delay
everything and see if you can revive your '601 patent.
Intuitive made that request, the request to delay after the
close of fact discovery after summary judgment when at that
point in time the trial was only two months away.  So what
that history I think makes clear is that when Intuitive
thinks it might benefit from a delay, it seems there is no
undue prejudice on these other patents.  It can wait on
these other patents when it thinks it might get another
patent in this case, yet when Intuitive thinks the Patent
Office will cancel the '276 patent, it wants to plow forward
with a trial on an invalid patent.

10:24:48 1          So for those reasons we think that a stay would

10:24:52 2     be warranted in this case.  Thank you.

10:24:54 3          THE COURT:  Thank you.

10:25:06 4          Why don't you address the points that we just

10:25:08 5     heard.  So you guys wanted a stay, no prejudice to stay the

10:25:13 6     case then, why is it prejudicial to stay it now?

10:25:19 7          MR. TUCKER:  Sure.  Thank you.  Dan Tucker on

10:25:23 8     behalf of Intuitive.

10:25:24 9          The facts of what happened with respect to the

10:25:29 10    '601 patent which Mr. Maier --

10:25:31 11         THE COURT:  Why wasn't it prejudicial then to

10:25:33 12    stay the case involving these patents but it purportedly is

10:25:41 13    prejudicial now.

10:25:41 14         MR. TUCKER:  So we were given a choice and we

10:25:43 15    were given a choice between going forward without the '601

10:25:46 16    patent entirely or --

10:25:48 17         THE COURT:  I know what the choice was, I just

10:25:50 18    want to know why suddenly delaying this case now is

10:25:55 19    prejudicial, but before you delayed all these same patents

10:26:01 20    and issues from going forward and it wasn't.

10:26:04 21         MR. TUCKER:  I think it goes to the timing, Your

10:26:06 22    Honor.  So the '601 was different because it was a final

10:26:09 23    written decision from the PTAB that had a definite ending,

10:26:12 24    it was going to the Federal Circuit and that was going to be

10:26:16 25    the decision --

10:26:16 1          THE COURT:  What if I say fine, I'm going to

10:26:19 2   stay this until next April because that's what they told me,

10:26:22 3   and if it's not finished by next April, we'll go to trial

10:26:26 4   immediately, then we have a finish, so why isn't that

10:26:31 5   prejudicial?

10:26:33 6          MR. TUCKER:  I think we have seen in this case

10:26:35 7   when a new trial date is set, sometimes because of the

10:26:39 8   Court's busy docket, because of the parties' busy schedules,

10:26:41 9   that date doesn't always stick.  The parties have been

10:26:44 10  moving towards this trial date that has been on the schedule

10:26:47 11  for over seven months and we think that that trial date

10:26:50 12  should stick and we shouldn't be kicking the can down the

10:26:53 13  road so to speak to go to April which something else may

10:26:59 14  come up and there may be conflicts with the parties'

10:27:01 15  schedule or the Court's busy calendar and that gets kicked

10:27:05 16  down the road even further.

10:27:07 17         THE COURT:  So tell me what we have to do about

10:27:09 18  all this damages stuff.

10:27:10 19         MR. TUCKER:  Sure.

10:27:11 20         THE COURT:  So I want to make this so that the

10:27:12 21  jury doesn't just come back with a number and says you owe

10:27:18 22  $10 million or $20 million because then what happens if the

10:27:26 23  Patent Office says that all these claims are invalid?  I

10:27:30 24  want something where we know with certainty, so how do we

10:27:32 25  get there because it sounds like your expert didn't already

10:27:36 1   opine on something that would get us there.

10:27:40 2              MR. TUCKER:  So we disagree that our expert

10:27:42 3   didn't opine on that.  And I think we can point you to

10:27:46 4   Exhibit 3 of Auris's motion which is Exhibit 3B of

10:27:51 5   Dr. Prowse's report.  And I don't have that on the slide but

10:27:55 6   I do have hard copies of it that I'm happy to --

10:27:58 7              THE COURT:  Hold on.  Give me a DI number,

10:28:05 8   because I have briefs, I have declarations.

10:28:10 9              MR. TUCKER:  Sure, my biggest hesitancy, Your

10:28:13 10  Honor, I have the report that I can show you on the screen,

10:28:16 11  but I know that the courtroom is not sealed right now.

10:28:18 12             THE COURT:  It's not going to be, so if you want

10:28:21 13  me to look at it, I can, but you have to give me some

10:28:24 14  guidance to find what you're talking about.  Give me a DI

10:28:28 15  number.

10:28:30 16             MR. TUCKER:  Sure.  It is Exhibit 3 to 440, DI

10:28:36 17  440.  And specifically it is the PDF page 7 of that exhibit.

10:28:53 18             THE COURT:  Okay.  Hold on.  Okay.  Exhibit 3 is

10:28:56 19  the reply report of Dr. Prowse?

10:29:01 20             MR. TUCKER:  That's correct, Your Honor.  It's

10:29:02 21  excerpts from the reply report.  And I would like to direct

10:29:06 22  your attention to PDF page 7 which is the second to last

10:29:10 23  page.

10:29:14 24             So in the report --

10:29:16 25             THE COURT:  Exhibit 3A?

10:29:22 1                    MR. TUCKER:  It's Exhibit 3B, actually.  It's

10:29:26 2      the next page.

10:29:46 3                    THE COURT:  Okay.  I have it.

10:29:48 4                    MR. TUCKER:  Great.  So in his report,

10:29:50 5      Dr. Prowse explains that the royalty rate will not change

10:29:53 6      based on whichever combination of patents are found valid

10:29:58 7      and infringed.  And you can see his calculation here, he

10:30:02 8      explains that if it were the '276 patent that were -- that

10:30:07 9      was the latest patent in terms of its expiration to be valid

10:30:11 10     and infringed, he gives a number.  He also relevant to this

10:30:15 11     gives a number if it were to be the '056 patent.

10:30:19 12                   So for Auris to say he didn't delineate between

10:30:22 13     the damages numbers for which patent would survive or which

10:30:28 14     patent wouldn't I think is not correct.  And we submit that

10:30:32 15     the jury verdict or the jury could easily be asked okay,

10:30:38 16     what is the damages award with respect to the '276 patent?

10:30:42 17     What is the damages award with respect to the '056, '906 and

10:30:47 18     '447 patents?  Dr. Prowse has done the math, and he could

10:30:52 19     explain that to the jury.  So we disagree actually that this

10:30:55 20     would be an issue.  And Auris admits that their own expert

10:31:00 21     did a patent-by-patent analysis.  So we don't think this is

10:31:04 22     an issue at all that would come up.

10:31:06 23                   I also would just note for the Court that this

10:31:09 24     concern about, you know, well, what would happen if we go to

10:31:11 25     trial on multiple patents and then later one of the patents

10:31:17 1    is invalidated, for example, on JMOL, or found not infringed

10:31:22 2    on JMOL.  This is not a unique situation to this case.  And

10:31:26 3    the Court can come up with ways to deal with that and the

10:31:29 4    parties can come up with ways to deal with that and we think

10:31:32 5    we can come up with a solution in this case so that the

10:31:35 6    verdict form would be durable enough, so to speak, that if

10:31:41 7    there was an issue with the '276 patent after trial, it

10:31:45 8    could be dealt with.

10:31:49 9           THE COURT:  Okay.

10:32:02 10          MR. TUCKER:  So I wanted to -- there was a lot

10:32:05 11   of talk toward the end about the prejudice factor.  I would

10:32:10 12   like to talk about that briefly as well, and then I'll come

10:32:15 13   back to the simplification issue, if that's okay.

10:32:29 14          On the undue prejudice, or tactical advantage

10:32:35 15   prong of the test, the Court looks at four different

10:32:38 16   factors, the timing of the request for review, in this case,

10:32:41 17   Auris waited thirty-nine months after trial, or after the

10:32:44 18   complaint was filed to submit its EPR petition.  That was

10:32:49 19   after it failed to challenge the patents in an IPR.  It

10:32:52 20   waited twelve months to file that IPR, to the end of the

10:32:52 21   statutory deadline.  And then after that was denied, it

10:33:02 22   waited an additional twenty-one months for

10:33:02 23   thirty-nine months total after the complaint was filed to

10:33:10 24   file its EPR.  Now Auris said today that well, we waited

10:33:12 25   until the Court stayed the case with respect to the '601

10:33:20 1   patent.  I think that's the height of gamesmanship.  That

10:33:24 2   just shows that they waited until there was an opening, they

10:33:27 3   laid low and they filed their EPR position.

10:33:31 4        I would submit what would happen in this case if

10:33:34 5   the Court were to stay the trial pending the '276 patent,

10:33:39 6   what is to stop Auris then from filing an *ex parte* re-exam

10:33:44 7   against the '056 patent.  I think everybody would agree that

10:33:49 8   that's gamesmanship and that's exactly what they did --

10:33:50 9        THE COURT:  Well, this one makes a little more

10:33:52 10   sense because it's the one that it hasn't expired, right?

10:33:55 11        MR. TUCKER:  It has not expired.

10:33:57 12        THE COURT:  It has not expired and it's got the

10:33:59 13   biggest damages.  I get what you're saying, I guess they

10:34:03 14   could go after the '447 patent, but it's expired, right?

10:34:06 15        MR. TUCKER:  The remaining three patents are

10:34:08 16   expired.

10:34:09 17        THE COURT:  So what you're suggesting isn't

10:34:11 18   really a likely scenario so that one doesn't really move me.

10:34:15 19        MR. TUCKER:  Sure.  I think one of the other

10:34:17 20   factors is the timing of the request for the stay under this

10:34:20 21   tactical advantage.  Their timing of the request for the

10:34:22 22   stay, they waited fifteen months after the EPR was

10:34:26 23   instituted.  Mr. Maier said well, they needed to wait until

10:34:29 24   the final office action or the nonfinal office action came

10:34:32 25   out, but they waited seven weeks and six days to file their

stay motion after that happened.  So there is even delay based on their own timeline.

And then finally, a big factor here is the status of the proceedings.  These proceedings, I disagree with Mr. Maier that we're waiting for one more thing in these proceedings.  We are not waiting for one more thing. We don't know the timeline of the *ex parte* re-exams. They're open ended.  They are not subject to a statutory bar like IPR's.  They can go on for years.  The examiner could issue a final office action next.  She could also issue a nonfinal office action or notice of allowance.  The case could be stuck in appeal before the PTAB, we don't know, there is no timeline like there is for IPR decisions, plus there is more to do.  So at the very least in this *ex parte* re-exam, there would need to be a nonfinal office action, a response, an advisory action, a notice of appeal, three sets of briefs to the PTAB, an oral hearing at the PTAB, and the PTAB would have to render its decision, that's all before we even get to the Federal Circuit.  So we submit this isn't just a matter of the case going for a couple more months, this re-exam is going to continue on for two-plus years if we have to continue fighting it.

The fourth factor is the relationship between the parties, the fourth factor under the undue prejudice or clear tactical advantage.  And here the relationship between

the parties is that we're competitors.  This is a

competitor-competitor suit and Intuitive is asserting its

intellectual property against its direct competitor in the

market.

THE COURT:  Are you going to assert -- are you

going to ask for an injunction with respect to the '276

patent?

MR. TUCKER:  I'm glad you brought that up.  In

our opinion we disagree that this is only about damages.  We

don't think we have given up the ability to seek a permanent

injunction.  It's pled in the complaint.  We have experts

talking about it.  So we were a little surprised to hear

that.  I think the slide said we could not seek a permanent

injunction.  Maybe that's true with respect to the expired

patents, but we don't think that's true with respect to the

'276 patent.

Finally just the last point on undue prejudice

and clear tactical advantage to Auris, Auris alleges that we

haven't shown prejudice but the Chronos and 3D licensing

cases both found prejudice when there was even a shorter am

of clay to file a re-exam and shorter amount of delay to

seek a stay, and so we think there is more than sufficient

evidence here based on Auris's own action of undue

prejudice.

Just real quick moving up to the stage of the

10:37:20 1    litigation factor, I don't think there can be any dispute

10:37:23 2    that the stage of the litigation that we're in right now

10:37:26 3    favors denying Auris's motion and denying the stay.

10:37:28 4            And so with that, I would like to talk a little

10:37:31 5    bit about the simplification factor, the final -- the last

10:37:36 6    of the three factors that I'll discuss.  There is -- this

10:37:44 7    re-exam is only going to touch one in four patents.  It's

10:37:47 8    only going to touch forty percent of the claims in the case.

10:37:52 9            To further complicate this, re-exams are not

10:37:55 10   certain, not just their end date but how they are going to

10:38:02 11   resolve patents and the claims that are challenged.  These

10:38:08 12   statistics on slide 3 are the statistics that Auris

10:38:13 13   propounded, but we were just pointing out that even if you

10:38:17 14   look at these statistics and even if you say okay, we're

10:38:20 15   arguing only the independent claim at this point, if all

10:38:26 16   claims are confirmed 21 percent of the time and all claims

10:38:29 17   are canceled 14.2 percent of the time, that means that all

10:38:33 18   claims are confirmed one-and-a-half times more likely than

10:38:37 19   when all claims are canceled.  So this is far from just a

10:38:42 20   conclusion that these claims are going to go away.  In fact,

10:38:45 21   we submit that there is a very good chance that they won't

10:38:49 22   go away.  So instead of grappling really I think with the

10:38:52 23   notion that it's only 1 of 4 patents that is being

10:38:59 24   challenged and by the way, there is no case other than the

10:39:02 25   *AgroFresh* case that Mr. Maier talked about that Auris cites

where the Court has granted a stay where it's been anything other than really a super majority, either all of the patents and all of the claims were challenged or in the Ethicon case, it was fifteen -- fourteen or fifteen of the sixteen claims that were challenged at the PTAB.

So instead of grappling with that they talk about the damages, it's 97 percent of the damages and within that is kind of the assumption I think that the parties are going to spend 97 percent of their time at trial on that patent.  And I think that's just wrong.  I think it's wrong for a couple of reasons.  One is that we've demonstrated throughout the whole case that we are going to defend all of our patents, all of our intellectual property, and Auris has hard fought for other patents that were of lesser value.

So, for example, in their summary judgment briefing, summary judgment of non-infringement, again, we were limited because we were limited by the number of pages. They didn't spend 97 percent of their time on the '276 patent.  They divided their pages equally between the '056 which they say is only $4 million, the '601 and the '276. And we submit that that's going to be how trial goes, too.

This case is more than about damages to Intuitive, it is about defending its intellectual property against a direct competitor in the market and we intend to do so vigorously with respect to all the patents.  So I

10:40:39 1    think Auris's continued discussion about the damages while

10:40:43 2    it may sound interesting is not really the driving issue in

10:40:49 3    this case, and it's not -- the number of issues are not

10:40:53 4    going to be reduced simply because the patent with the

10:40:57 5    largest amount of damages is under re-exam.

10:41:12 6             I wanted to just address one more point and make

10:41:16 7    sure that we answer any questions that the Court has on

10:41:21 8    this.  Auris discussed in their brief and they discussed

10:41:24 9    today the re-exam and the examiner interview that we had

10:41:28 10   with the examiner.  Auris characterizes this as us

10:41:32 11   backtracking from some statement we made.  That's not what

10:41:36 12   happened.  So in these re-exams, you have an interview with

10:41:41 13   the examiner, it's not like a court hearing today where

10:41:44 14   there is a transcript.  The examiner submits what he or she

10:41:48 15   believes is an accurate summary of what was discussed during

10:41:52 16   the interview.  The applicant then has the ability and the

10:41:56 17   right to respond to that and to correct any inaccuracies.

10:41:59 18   This happens during hour long interviews where there is no

10:42:04 19   transcript just like it happens in meetings with minute

10:42:08 20   takers.  And so we corrected the examiner's summary, we

10:42:12 21   explained that we didn't say what the examiner thought he

10:42:16 22   heard us say and the proof or the support for that is we

10:42:20 23   didn't make these arguments in our patent owner response.

10:42:23 24   We didn't need to make this statement that the examiner said

10:42:27 25   we made in order to distinguish the prior art.  It's nowhere

10:42:31 1    in the patent owner response.  And so this isn't an issue

10:42:34 2    like the case law that Auris cites where a patent owner made

10:42:38 3    an affirmative statement in a paper in re-exam and then

10:42:42 4    tried to backtrack it at trial.  We never made the statement

10:42:45 5    and we corrected it immediately in the record and our

10:42:49 6    written statements to the Patent Office bear that out that

10:42:51 7    we didn't need to make that argument.  So I just wanted to

10:42:54 8    make sure that we clarified that because we didn't get a

10:42:57 9    chance to brief it because it was raised in the reply brief

10:43:03 10   just based on the timing of the events.

10:43:05 11          If Your Honor doesn't have any other questions,

10:43:07 12   I would submit we're three-and-a-half months from trial.

10:43:10 13   Auris waited thirty-nine months to file this EPR and over a

10:43:14 14   year to request a stay.  The EPR only touches a fourth of

10:43:17 15   the patents, forty percent of the claims and we don't know

10:43:20 16   of any case that has been stayed so close to trial where the

10:43:24 17   movant waited so long to file a re-exam request that only

10:43:28 18   can touch such a small subset of the claims.

10:43:32 19          Thank you.

10:43:33 20          THE COURT:  Okay.

10:43:38 21          MR. MAIER:  Your Honor, may I have

10:43:40 22   thirty seconds to discuss the question you asked?

10:43:45 23          THE COURT:  You may.

10:44:02 24          MR. MAIER:  Thank you, Your Honor.  I do have

10:44:15 25   the response to your question and then three points in

10:44:16 1    rebuttal.

10:44:17 2                THE COURT:  Okay.

10:44:18 3                MR. MAIER:  Yes, Your Honor, we would be willing

10:44:19 4    to stipulate not to assert the system prior art either at

10:44:23 5    trial if we get the stay.  So no invalid --

10:44:27 6                THE COURT:  Okay.  But my question actually went

10:44:28 7    a little broader.  Do you still have prior art defenses that

10:44:33 8    would be raised as to this patent?

10:44:36 9                MR. MAIER:  Not to the '276, that would be all

10:44:39 10   invalidity.

10:44:40 11               Just three quick points in response to

10:44:42 12   Mr. Tucker's argument.  We talked about this ability to

10:44:45 13   somehow get injunctive relief.  Their damages is asking for

10:44:50 14   money through the life of the patent.  There would be no

10:44:52 15   period for injunctive relief after that.  They're getting

10:44:55 16   paid through the expiration of the patent, so there is no

10:44:59 17   more room for injunction.

10:45:00 18               He also mentioned that the office -- the final

10:45:05 19   office action isn't the last thing, that there could be

10:45:08 20   another nonfinal office action.  That happens during regular

10:45:11 21   prosecution because you can have another nonfinal action if

10:45:15 22   the examiner comes up with new prior art, right, but here

10:45:18 23   it's an EPR.  The prior art that's at issue is already

10:45:21 24   defined, so it's very unlikely we get an examiner looking

10:45:25 25   for new art and adding another nonfinal action, now we're

10:45:30 1   waiting for a final action.

10:45:31 2           On the point about damages, I'm not sure what

10:45:34 3   the point of that exhibit was because all it shows is that

10:45:38 4   they're asking for one royalty rate no matter how many

10:45:41 5   patents are in the case.  So it doesn't resolve the problem

10:45:45 6   of let's say that the jury awards a damages figure, how do

10:45:50 7   we extract how much was attributable to the '276 versus the

10:45:55 8   others?

10:45:55 9           THE COURT:  We ask them.  I mean, did your

10:45:59 10  damages expert say this for this patent, this for this

10:46:03 11  patent, this for this patent, this for this patent?

10:46:05 12          MR. MAIER:  It was a rate, our expert said that,

10:46:09 13  theirs did not.

10:46:10 14          THE COURT:  Okay.  I just saw a chart where it

10:46:12 15  says this for this patent, this for this patent, so I don't

10:46:16 16  understand why we can't just ask the jury, how much for

10:46:19 17  this, how much for this, how much for this, and how much for

10:46:21 18  this.

10:46:22 19          MR. MAIER:  Because that chart you saw was

10:46:23 20  cumulative, it was seven percent across the board.  That

10:46:26 21  seven percent was not three-and-a-half for this half patent,

10:46:29 22  half for this patent, two for this patent.

10:46:32 23          THE COURT:  Yes.  So they want seven percent for

10:46:35 24  any patents, the sales on accused products that infringe a

10:46:38 25  particular product.  I don't understand why this is so hard.

10:46:41 1   You ask a jury either what royalty rate gets applied, but if

10:46:46 2   you guys don't want a royalty rate, then what's the number

10:46:51 3   for infringement of this patent?  What is the number for

10:46:52 4   infringement of this patent?  What's the number for

10:46:54 5   infringement of this patent?  What's the number for

10:46:57 6   infringement of this patent?  I don't understand why that's

10:46:59 7   so hard.

10:47:00 8               MR. MAIER:  Well, their expert asked for a lump

10:47:02 9   sum, so he's --

10:47:03 10              THE COURT:  But he broke it down by patent.

10:47:07 11              MR. MAIER:  That isn't split up in any way by

10:47:11 12   patent, it's just one rate that the only thing that

10:47:13 13   determines the amount --

10:47:15 14              THE COURT:  I don't understand.  So what?  What

10:47:17 15   if they didn't even give a number, they just said we want

10:47:22 16   seven percent, we want seven percent of the sales of

10:47:25 17   products that are accused of infringing.

10:47:27 18              MR. MAIER:  What happens if the jury in their

10:47:29 19   mind are awarding seven percent for the '276 patent -- or

10:47:30 20   six percent and then one percent for the other three, how do

10:47:37 21   we --

10:47:37 22              THE COURT:  Why in the world would they do that?

10:47:40 23   Do you guys have them telling the jury?

10:47:42 24              MR. MAIER:  I don't know how they're going to do

10:47:44 25   this verdict form, that's the question.

10:47:46  1                    THE COURT:  All right.  I don't think we have to

10:47:47  2       figure that out now.  We can figure that out in September.

10:47:52  3       Go ahead.

10:47:52  4                    MR. MAIER:  Those are the couple of points that

10:47:55  5       I wanted to raise.  And then the other point is they did

10:47:59  6       bring up this point that I don't think Your Honor was

10:48:01  7       interested in, well, what if we file another EPR.  Well,

10:48:05  8       that we couldn't do because this stay is at our request, so

10:48:09  9       if we're requesting a delay, we're not going to then say

10:48:12 10       well because of this delay that we asked for, we get to file

10:48:15 11       something else.  The reason it wasn't prejudicial when we

10:48:18 12       filed our EPR is because it was Intuitive that was asking

10:48:22 13       for the delay.  So that's the distinction there.

10:48:25 14                    So unless Your Honor has further questions.

10:48:28 15                    THE COURT:  Okay.  Thank you.

10:48:29 16                    MR. MAIER:  Thank you.

10:48:33 17                    THE COURT:  All right.  Thank you, counsel.

10:48:34 18       Thank you for the arguments today and for the briefing.  I

10:48:40 19       am going to deny the motion.  In addressing the motion to

10:48:44 20       stay I have broad discretion.  I have reached my decision by

10:48:47 21       reviewing the factors that courts typically look at in these

10:48:50 22       circumstances; whether the stay will unduly prejudice or

10:48:54 23       present a clear tactical disadvantage to Intuitive, the

10:48:58 24       nonmoving party; the whether a stay will simplify the issues

10:49:00 25       in question in the trial of the case; and three, whether

10:49:03 1    discovery is complete and the trial date has been set.

10:49:05 2            Start with the last of those.  Here discovery is

10:49:08 3    essentially over and we have a trial scheduled for a few

10:49:10 4    months from now.  There is not much work to do that is going

10:49:14 5    to be wasted if we were to go forward, so when I consider

10:49:18 6    the status of the case as well as the status of the

10:49:21 7    re-examination which has been instituted, I think that this

10:49:25 8    factor favors denial of the stay.

10:49:28 9            As to simplification of the issues, the EPR only

10:49:32 10   addresses one of the four patents so we're going to have to

10:49:34 11   have a trial regardless of the outcome of the EPR.  I

10:49:38 12   understand that Auris has agreed to drop its prior art

10:49:41 13   defenses as to that patent if the stay were to be granted

10:49:44 14   and I understand that Auris argues that the damages issue

10:49:48 15   will be simplified because most of the damages are

10:49:51 16   addressing the '276 patent, but I think that we can figure

10:49:54 17   out how to allot damages at trial so that we can tell what,

10:49:58 18   if any, damages awarded are assigned to the '276 patent.

10:50:03 19           Lastly looking at prejudice, I have also

10:50:06 20   considered the factors that courts review in addressing

10:50:09 21   undue prejudice and tactical disadvantage.  With respect to

10:50:12 22   the timing of the request for a review and the request for a

10:50:15 23   stay, the request for a stay is coming awfully late and well

10:50:19 24   after we had originally tried to schedule a trial in this

10:50:22 25   matter.  I understand that some of the reasons for that

10:50:24 1   delay involves Intuitive's own delays in getting this matter

10:50:29 2   moving when it thought that that was to its advantage, but

10:50:33 3   nevertheless, the motion is coming awfully late in the game.

10:50:36 4            With respect to the status of the EPR

10:50:38 5   proceedings, there is no statutory time for those to finish.

10:50:41 6   Although Auris says that the median time is eighteen months,

10:50:44 7   I'm not sure that the median means much here.  It could be

10:50:47 8   less than eighteen months or substantially more than that,

10:50:50 9   but because we don't know, granting this request could

10:50:53 10  result in essentially an open ended stay.

10:50:56 11           And finally I did take into account the parties'

10:50:59 12  relationship.  They are competitors.  So taking all of this

10:51:03 13  together I find that Intuitive will be unduly prejudiced and

10:51:07 14  tactically disadvantaged by yet another stay of this case

10:51:09 15  which is in its fifth year, I think.

10:51:12 16           So for the stated reasons, the motion is denied.

10:51:16 17  If, however, it occurs that there is a final rejection of

10:51:20 18  that patent before trial begins, let me know and we can

10:51:23 19  decide what to do at that point.

10:51:25 20           So that is my ruling on the motion.

10:51:29 21  Additionally, we are going to be issuing an oral order on

10:51:32 22  the docket, that's akin to what Judge Andrews has been doing

10:51:36 23  in his scheduling orders, requiring that the parties hire a

10:51:42 24  mediator and engage in mediation in advance of the pretrial

10:51:47 25  conference.  So you can expect to see that on the docket

10:51:50 1    shortly as well.

10:51:52 2               All right.  Anything else that we need to talk

10:51:55 3    about while we are here?

10:51:57 4               MR. PACKIN:  Good morning, Your Honor.  Tamir

10:52:03 5    Packin.  I am very reluctant to bring this up, but I think

10:52:07 6    that I have to bring it up now which is the trial is

10:52:11 7    currently scheduled to start on Yom Kippur which is that

10:52:16 8    Monday which I'm co-lead counsel for Auris, and it's a

10:52:22 9    personal issue for me.  And I understand there are folks on

10:52:25 10   both sides as well as potential witnesses for whom that is

10:52:29 11   an issue.  So I'm at Your Honor -- we're not asking to delay

10:52:33 12   anything, I totally understand that, but in terms of

10:52:36 13   accommodating the Jewish holiday for the Monday, I don't

10:52:41 14   know if Your Honor would be willing to start the trial on

10:52:44 15   Wednesday or maybe start Thursday or Friday before and take

10:52:49 16   a dark day or two.  We're flexible.  We're not trying to

10:52:54 17   delay the case obviously.

10:53:02 18              MR. DeCOSTA:  Your Honor, Frank DeCosta for

10:53:06 19   Intuitive.  And while we're sympathetic about counsel's

10:53:09 20   request, we too have folks who observe the holiday on our

10:53:11 21   side, but as you heard during the hearing we're really

10:53:12 22   anxious to get this case tried and reluctant to have the

10:53:22 23   window slip.  We have lots of witnesses we've been wrangling

10:53:27 24   and trying to hold this week open on the calendar, very

10:53:31 25   senior people within Intuitive, so we're concerned that

10:53:33 1    missing days, skipping days, shifting days, we'll run the

10:53:37 2    risk of losing those witnesses.

10:53:44 3                    THE COURT:   What if we start on Tuesday?   It

10:53:48 4    doesn't seem like much of a slip for your witnesses.   Your

10:53:51 5    witnesses are going to be coming first, so why don't we

10:53:55 6    start Tuesday.

10:53:56 7                    MR. DeCOSTA:   And completing the trial on

10:53:58 8    Friday, Your Honor, just compressing the trial?

10:54:01 9                    THE COURT:   Well, I have another trial beginning

10:54:03 10   the following Monday, but we can probably give you a few

10:54:08 11   extra hours if necessary on that Monday when there would be

10:54:12 12   closings or whatever, which I don't think you have to worry

10:54:15 13   about your witnesses so much.

10:54:17 14                   MR. DeCOSTA:   I think that would be acceptable.

10:54:20 15   We would have to check with witnesses.

10:54:21 16                   THE COURT:   That's what we're going to do, so

10:54:23 17   why don't you get your witnesses in line.   If you want to go

10:54:26 18   to trial, you'll get your witnesses to agree to that because

10:54:29 19   I'm not going to force folks to come in on the holiday.

10:54:32 20                   Anything else?

10:54:33 21                   MR. DeCOSTA:   No.

10:54:34 22                   MR. PACKIN:   Thank you, Your Honor.

10:54:36 23                   THE COURT:   All right.   Thanks everyone.

          24                   (Court adjourned at 10:54 a.m.)

          25

1

2      I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

3            /s/ Dale C. Hawkins
            Official Court Reporter
4            U.S. District Court

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25